Lucy Gray, and others, *vs.* Edmund Lynch and Samuel McDonald, and others.—*December,* 1849.

The *English* chancery rule, in regard to the securities in which trust funds must be invested, has never been literally nor analogically extended to *Maryland.*

In this State trustees, holding funds directed to be invested in stocks, have always been in the habit of making such investments in *bank stock,* and if such usage had never before existed, its commencement would have been analogically justified by the 4th and 5th sections of the act of 1831, ch. 315, empowering the orphans courts, in their discretion, to order executors,

Gray, *et al.*, *vs.* Lynch and McDonald.—1849.

administrators and guardians to invest trust funds, in their hands in *bank stock.*

A testator devised to three trustees, *by name*, certain property in trust, to sell and convert it into money, and invest the proceeds in "*some safe and profitable stock*," which they were to hold in trust, for the sole and separate use of the testator's two daughters.  HELD: that this was a power coupled with an interest or trust, which, upon the death of one, could be executed by the surviving trustees.

A mere naked power to sell, not coupled with an interest, does not survive, but when the power is coupled with an interest, it may be executed by the survivor, and it is the possession of the legal estate, or a right in the subject over which the power is to be exercised, which makes the interest in question.

Where a power *per se*, is merely naked, yet if, in other parts of the will, there are trusts and duties imposed, which require a sale to effectuate the intent of the testator, the power survives.

As co-trustees have an authority coupled with an interest, their office survives.

The act of 1822, ch. 162, abolishing estates in joint tenancy, does not apply, and was never intended to apply to devises or grants made to trustees, for the benefit of third persons.

Where trustees were directed, by the will, to invest money in stock, and hold the same in trust for certain purposes, after an investment was once made, if the money should be returned to them without default on their part, they would have the power, and would be bound to provide for its re-investment.

Where the trustee, without application to the court, does an act which, upon application, would have been ordered, and was, at the time it was done, obviously for the benefit of all concerned, his act will be ratified and affirmed, and held of the same validity as if previously ordered by the chancellor.

The direction, to invest in "some safe and profitable stock," does not restrict the discretion of the trustees, and limit them in their selection to stocks already existing; they could subscribe for stocks about to be created.

The trustees had invested a portion of the trust fund in the stock of the old *Bank of the United States*, and when its charter was about to expire, they, with all the other non-resident stockholders, executed a power of attorney, authorising *N B* to act for them, in relation to an application for a charter to any State legislature, and the acceptance thereof.  Application was accordingly made, and the charter granted by *Pennyslvania* was accepted by all the stockholders of the old bank, except the *United States*, and the shares of all the stockholders so applying, were afterwards changed to an equal number in the new bank, by *N B*, all whose acts, so far as they were concerned, the trustees ratified and confirmed.  HELD:

That these proceedings did not constitute a breach of trust on the part of

these trustees, and they were not responsible for the loss subsequently arising to the trust fund, from the failure of the new bank.

A trustee is not chargeable with more than he has received, unless there is evidence of very gross negligence, amounting to wilful default.

Where trust moneys are once properly invested in stock, the trustees cannot, without express authority, dispose of the stock, and invest it in other securities.

Where a trustee has acted with good faith in the exercise of a fair discretion, and in the same manner as he would ordinarily do in regard to his own property, he ought not to be held responsible for losses accruing in the management of the trust property.

Appeal from the *Court of Chancery*.

*Benjamin Fergusson* died in 1828, leaving a last will and testament, by which he devised and bequeathed all his property to *James Campbell, Edmund Lynch, and Samuel McDonald,* whom he appointed his executors, in trust, to sell and convert it into money, except certain specified portions, and then provided as follows:

"And it is my will and desire, that when all my property, not heretofore otherwise disposed of, is sold, and the proceeds received by my said trustees, that *they shall invest the same in some safe and profitable stock*, and shall also invest all money which I may have on hand, and all that may become due to me or my estate, from notes and debts, (first, however, paying all just debts, &c.,) in *the same manner*. And it is my will and desire, that the said stock shall be held, in trust, by the said *James Campbell*, and *Edmund Lynch*, and *Samuel McDonald,* for the sole and separate use of my two daughters, *Mary Owen*, and *Ann Gray*, during their natural lives, free from all control of their husbands, and, at the death of either of them, her moiety for the use of her children, equally, and their heirs, forever."

The three trustees and executors qualified and acted together in the discharge of the trusts and duties imposed upon them by the will, until April, 1832, when *Campbell* died. The two surviving trustees, from that time, continued to discharge the trusts of their office.

On the 2nd of June, 1845, the appellants, *Mary Owen* and her children, and the children of *Ann Gray*, (who died in June, 1844,) filed their bill against *Lynch* and *McDonald*, the surviving trustees, for an account of the trust. It charges an illegal conversion and misapplication of testator's interest in the *Union Line of Steamboats*, but as this part of the case was. fully settled and arranged, *pendente lite*, no questions arise in reference to it. It then charges, that after all debts, &c., had been paid, there remained, in the hands of the three trustees named in the will, the sum of $104,000, exclusive of the interest in said line of steamboats, and that complainants are entitled to have a full and strict account of the same, and all interest and dividends thereon, or which ought to have accrued therefrom. It then charges, that the children of *Ann Gray*, deceased, are entitled to have one moiety of all said trust, moneys, &c., to their own use, discharged of the trust. It then sets forth the death of *Campbell*, and prays that the surviving trustees may render a full account of their trusts, and particularly in what stocks they invested said moneys, the date, amount, and value of such investments, and the dividends arising thereon, &c., that an account may be taken, and the will executed, and the balance that may be found due complainants, may be paid to them by said surviving trustees, and by *Robert Thompson*, the administrator of *Campbell*, who is made a defendant. The bill also makes *William Owen*, the husband of *Mary Owen*, a defendant, and prays general relief.

The answer of *Lynch and McDonald*, gives a full explanation of all their transactions relating to their trust, but only that part of it is material to this case, which relates to certain investments in stocks of the *Bank of the United States*, and the statements in relation to which, are admitted to be true. This part of the answer admits the investment by the three trustees in July, August, and October, 1829, of $38,088.25, of the trust estate in stock of the *Bank of the United States*, and avers, that they paid over the dividends to *Mrs. Owen* and *Mrs. Gray*, the *cestuis que trusts* for life, and that said investment continued unaltered until the charter of said bank expired,

and was always deemed, by these defendants, and others interested, as a safe and profitable investment.

" That when the charter of said bank was about to expire, the stockholders therein being unable to obtain a renewal of their charter from the Congress of the *United States*, applied to the legislature of *Pennsylvania* for a charter to enable them to continue the business, which charter was granted, and in the winding up of the business of the old bank, most, if not all of the stockholders of the said *Bank of the United States*, agreed to take stock in the new incorporation thus chartered, by the name of *The President, Directors and Company of the Bank of the United States*, it being the general opinion of the commercial community, as well as of others, that said new bank would be equally safe and productive as the preceding one, whose charter was just expiring. And these defendants being desirous to discharge their duty in said trust, and believing firmly that it would be for the interest of said trust estate, to invest in the said new bank the amount which had previously been invested in the *Bank of the United States*, chartered by Congress, consulted with various persons, in whose judgment they had confidence, as to the propriety of so doing, and found that every one with whom they or either of them consulted, thought the investment would be safe and profitable. That after making these inquiries, these defendants being satisfied that such investment in the new bank, chartered as aforesaid, would be both safe and profitable, did make said investment by exchanging, in the early part of 1836, the two hundred and twenty-one shares of the stock of the *Bank of the United States*, so as aforesaid before that time held by them, for other two hundred and twenty-one shares of the new *Bank of the United States*, chartered as aforesaid, as was done by most, if not all of the other stockholders of said old *Bank of the United States*. And these defendants aver, that said *William Owen*, and *Mary Owen*, his wife, and *Ann Gray*, were fully aware of said change and investment having been made, and never at any time (until after the failure of said new bank,) in any way objected thereto; but, on the contrary, as these defendants

have reason to believe, and always did believe, they, and all others interested in said trust estate, fully approved thereof. And these defendants state, that after said exchange or investment, the said new *Bank of the United States* went on regularly, making dividends semi-annually, at the rate of eight per cent. per annum, (being one per cent., per annum, more than the old *Bank of the United States* paid,) and having fully the public confidence, so much so that the stock of said new bank was and continued considerably above par. And these defendants went on regularly receiving said semi-annual dividends up to and inclusive of the dividend in July, 1839, which was still at the rate of eight per cent. per annum, which dividends from said new bank so received, amounted, in the whole, to $6,188; and, as they received the said dividends, these defendants paid the same over to said *Mrs. Mary Owen* and *Mrs. Ann Gray*, who were entitled thereto, under the said will, and who never did, nor did any other person interested in said trust estate, at any time up to said July, 1839, make any objection to said investment, but, so far as these defendants knew, or had reason to believe, and did believe, entirely approved thereof. And these defendants say, that after said dividend of July, 1839, the said bank made no further dividend, but, for a long time, it was the general opinion, and the opinion of these defendants, that said bank was perfectly solvent, and would again go on to make dividends, as before, and, therefore, these defendants did not sell or dispose of said stock, which could only have been done at a great loss, and these defendants, as trustees as aforesaid, still hold the said stock as part of said trust estate. And this defendant, *Samuel McDonald*, answering for himself, states, that he and his father, the late *William McDonald*, were the owners of four hundred and ten shares of the *Bank of the United States*, aforesaid, chartered by Congress, for some time before the expiration of its charter and at that time, and that they exchanged their said four hundred and ten shares for four hundred and ten shares of the said new *Bank of the United States*, in the same manner and on the same terms as these defendants exchanged the aforesaid two hundred and

twenty-one shares so held by them, in trust; and that he, the said *Samuel McDonald*, and his father continued to hold the same, and have never disposed of any part thereof, always believing, until it was too late, that the said investment of their own means (amounting to about $47,150, at the estimated value of the stock at the time of the transfer,) was both safe and profitable. And these defendants aver, solemnly, that they, at the time of making the said original investments in the *Bank of the United States*, chartered by Congress, and at the time of exchanging the same for the said shares of stock of the said *Bank of the United States*, chartered by the State of *Pennsylvania*, believed the said investments, and each of them, to be safe and profitable investments, and as safe and profitable as any other that they could have invested in, and that they acted, in so doing, with entire good faith, and to the best of their respective and united skill and judgment, and as they would have done if the said stock, or the money invested therein, had belonged to themselves, and as, in fact, this defendant, *Samuel McDonald*, did act with his own stock, as above stated, to a much larger amount."

It was admitted and agreed, by an agreement filed in October, 1846, that the facts stated in the above portion of the answer are true, save, only, that the remainder men under the trust, did not expressly approve of said investment; some of them knew of it, and neither objected nor assented, while others knew nothing of it. By the same agreement, it was also admitted, that the market value of the stock in said bank, as chartered by Congress, was, on the 2nd of February, 1836, $113.50, and the value of the stock of said bank, as chartered by *Pennsylvania*, was, on 2nd of February, 1836, $125.50; March, $125.75; April, $121; May, $124; June, $125.50; July, $127.50; August, $125.62½; September, $121.50; October, $119.25; November, $110; December, $115.50; July 2nd, 1839, $114.

At March term, 1845, another agreement was filed, by which it was agreed and admitted, that in making the original invest ment of $27,088.25, in the stock of the *Bank of the United*

*States,* chartered by Congress, the trustees acted *bona fide* and judiciously, the stock in said corporation being in good credit. Also, that some time in February, 1836, shortly before the expiration of the charter of said bank, said *Lynch* and *McDonald,* as surviving executors and trustees, executed and delivered to *Nicholas Biddle* the following power of attorney, being similar to that executed by most, if not all, of the non-resident stock-holders:

"Know all men by these presents, that we, *E. Lynch* and *S. McDonald,* surviving devisees, in trust, of the estate of *Benjamin Fergusson,* citizen of the *United States,* actually resident therein, the owner of two hundred and twenty-one shares in the capital stock of the *Bank of the United States,* and the owner of no other shares in the capital stock of said bank, do hereby constitute and appoint *Nicholas Biddle, Esq.,* *President,* attorney and agent for us, and in our name, as the owner of said specified shares in the capital stock of said bank, to vote as our proxy at any election of directors of said *Bank of the United States,* and on any question that may arise or be put at a stated or special meeting of the stockholders of said bank, according to the number of votes we should be entitled to vote, if then personally present, and especially for us, and in our name, to vote and act upon all and every question, matter and thing that may arise or be put at any stated or special meeting, touching or concerning the winding up of the affairs of the bank, the creation of any trust or trusts, the appointment of trustees, and whatever else may be needful; and also touching and concerning any application or applications for a charter or charters to any State or States, or the legislatures thereof, or touching or concerning the acceptance of any such charter or charters, and for us and in our name, to vote as our proxy at any election of directors under any such charter or charters so accepted, and for us to sign and to seal any instruments that may be deemed necessary, and generally to decide and to act for us as fully as we might or could do, if personally present; meaning and intending that this power shall be most liberally construed, and be as broad and extensive as we can give with

power also, an attorney or attorneys under him, for that purpose to make and substitute, and do all lawful acts for effecting the premises, hereby ratifying and confirming all that our said attorney, or his substitute, shall do therein, by virtue hereof, hereby revoking all former powers.

" In witness whereof, we have hereunto set our hands and seals, this ———— day of February, in the year of our Lord, 1836.                              EDMUND LYNCH, (Seal.)
" Sealed and delivered in         SAM'L MCDONALD, (Seal.)
    the presence of,
        W. L. GILL."

To this power was attached an affidavit, by said *Lynch* and *McDonald*, that they were owners of the shares referred to therein, and that no other power had been given to any person, which is now in force, to vote for them at any election.

That all the stockholders of the old *Bank of the United States*, except the *United States*, united in the application to the legislature of *Pennsylvania*, for the charter of the *Bank of the United States*, and that when the charter had been obtained, a general meeting of the stockholders of the old *Bank of the United States* was, after due notice, convened at *Philadelphia*, on 19th February, 1836, and that said charter was unanimously accepted by all said stockholders in said *National Bank*, except the *United States*, and the treasurer of the *United States;* and notice of said acceptance of the charter being given to the governor of *Pennsylvania*, the said new *Bank of the United States*, was immediately organised, and went into operation under that charter.

That in this application, and in accepting the charter, said *Biddle* voted in the names of defendants, under said power of attorney, as he did for all others, whose powers of attorney he held, as above stated. That on the 19th of February, 1836, when the market value of the stock was $129.25, said *Biddle*, acting under said power of attorney, transferred, on the books of said bank, chartered by Congress, said two hundred and twenty-one shares, and converted the same into an equal number of shares in the State bank. That no dividend was made on

said stock of the new bank, until July 1st, 1836, and that all the acts of said *Biddle* were afterwards ratified and adopted by the stockholders, who had constituted him their attorney, and by said *Lynch* and *McDonald*, so far as they affected said two hundred and twenty-one shares. This agreement also incorporates the charter of the new bank, and the statements made by said *Biddle*, at the general meeting of the stockholders, and the resolutions voted for by him thereat, which are not in the record. This agreement also incorporates a statement or table showing the market value of the stock of the new bank, at certain dates therein mentioned, covering a period of five years, and showing a fluctuating decline to almost nothing. The prices in this table are sufficiently set out in other parts of this statement, and in the opinion of this court.

The case was then referred to the auditor, who made a report, and stated accounts sustaining the answer of defendants, and the complainants filed exceptions, all of which were withdrawn, except those relating to the investments made in the stock of the *Bank of the United States*, the substance of which is, that the defendants ought to have been charged with the amount of money invested, and interest on the market value of said stock, at the time the trustees converted it into shares in the new bank.

One of the complainants having become insolvent, the bill was amended so as to make his permanent trustee a defendant, and the chancellor, (JOHNSON,) on the 3rd of December, 1847, passed a *pro forma* decree, confirming the report and accounts of the auditor, and overruling the exceptions of the complainants, who appealed therefrom to this court.

The cause was argued before DORSEY, C. J., CHAMBERS, MAGRUDER, MARTIN, and FRICK, J.

MAY and BRENT, for the appellants, contended:

That the several exceptions filed by them to the auditor's report, touching the stocks taken in the *Bank of the United States*, chartered by *Pennsylvania*, should have been allowed,

and the said *Lynch* and *McDonald* held personally responsible for the amount of money, or the value of the stock in the *National Bank*, so by them illegally converted by taking stock in the *State Bank*, together with interest on said amount.

1st. Because the power to invest is, by the terms of the will, "to *James Campbell, Edmund Lynch,* and *Samuel McDonald,*" *nominatim*, and they are to hold the said investment in trust, &c., and, therefore, the power did not extend to *Lynch* and *McDonald*, the survivors, by whom the investment complained of, was made.

Under this head it is insisted, that to create a surviving power, it must be granted to the donees of the power as a class, and not to them by name, and as individuals, whose concurrent judgment and discretion are, as in this case, required.

2nd. Because, conceding even that the power survives, still, in this case, it was exhausted by the first investment, and there being no power to re-invest, it required the sanction of chancery, notwithstanding the temporary and limited duration of the first investment.

3rd. Because, regarded as a question of extent of power, it was a power only to invest in some already existing stock, and not a power to create a new and speculative stock, as has been attempted, in this case, by taking stock in the *Pennsylvania Bank*.

In support of this view, we refer to the terms of the will, limiting the power, and requiring it to be exercised by investing in "some safe and profitable stock." By which we understand the power to be confined to some stock which, by past experience, is to be taken as *prima facie*, safe and profitable, something which is reputed safe, and which, by past operations, has made profits; not the original creation of a stock, as in this case, saddled with an enormous incumbrance *in limine*, in the shape of an exorbitant bonus, which involves a sacrifice of the capital to a certainty, in part, and which depends wholly on speculation, whether it will, or will not be profitable in future.

Thus far we insist, that by the investment excepted to, there has been an excess of power in the acts of the trustees, and if

so, there is no necessity to consider the *bona fides* of their acts, the legality of which depend on the construction of their powers.

4th. Because, even on the hypothesis that the trustees did not exceed their powers, yet it was a gross abuse of power for these trustees to travel out of the State of *Maryland*, to create a new State bank, under the authority of the legislature of *Pennsylvania*, predicated as that bank was, upon principles and sacrifices of capital hitherto unknown in the history of such local banks, and in support of this view we refer to the charter in evidence, and the statements of *Nicholas Biddle*, also in evidence, made at the meeting of stockholders.

5th. Because the facts agreed show, that in making the investment complained of, the trustees did not act on their own personal judgment and discretion, but undertook, beforehand, to delegate all their discretion and judgment in the premises to *Nicholas Biddle*, by the power of attorney exhibited in the record, which, as practically carried out, devolved the trust to a stranger, under whose substituted agency this investment was made, thus depriving the *cestui que trusts* of that personal judgment and discretion of the trustees, which was required of them by duty and law, and which, under these circumstances, they cannot now invoke as their protection in this disastrous investment.

In support of this view, it will be seen that *Nicholas Biddle* was authorised by these trustees to apply to any State legislature for any kind of charter he thought proper, and to accept such charter according to his own individual judgment; that whatever might be the character of *Biddle's* acts, the trustees bound themselves to ratify them, and that the whole investment was, in fact, made by *Biddle*, under this power of attorney, and with no special approval or ratification of those acts of the substituted trustee, further than can be implied from the receipt of dividends by the trustees proper, at a time when the investment had been made by *Biddle*, and the agency consummated without the slightest exercise of personal judgment or discretion by the testamentary trustees.

6th. Because the evidence shows, that the stock taken in the *State Bank of Pennsylvania*, ceased to pay dividends in July, 1839, and after that date, underwent a fixed and gradual decline through a series of months, until it depreciated to a mere nominal value, during all which time the trustees took no action to protect the interests of the *cestui que trusts*, and have thus, by their gross laches, charged themselves with the full amount of loss to the trust fund.

Finally, it is insisted, that the pretext set up by the trustees, that they, or one of them, had invested a much larger sum of his own money in a similar way, and, therefore, he has acted *bona fide* with the trust funds, cannot be relied on as any equitable bar to the breach of fiduciary duty proved against the trustees, because very different considerations apply to the delicate discharge of the duties of fiduciary agents, and to the rights of individuals to waste or squander their own private funds.

We also deny that the acquiescence of the married women, *cestui que trusts* for life, in the disputed investment, can at all affect the liability of these trustees, or that the acquiescence of any of the remainder men, can affect such liability.

LLOYD and R. JOHNSON, for the appellees, contended:

1st. That it being admitted in the cause, that the original investment in the stock of the *Bank of the United States*, was authorised by the will, the defendants (appellees,) had the same authority to invest in the stock of the *Bank of the United States*, chartered by *Pennsylvania*.

2nd. That in exercising that authority, the appellees were only bound to observe such care and prudence as men of ordinary care and prudence would have observed in investing their own funds.

3rd. That having made the investment, the appellees were not responsible for the ultimate result, if they treated it afterwards *bona fide*, and as men of ordinary prudence would have acted, if the said investment had been their individual property.

4th. That the investment was known to the *cestui que trusts* for life, and their husbands, by whom the dividends in the original, as well as the substituted investments, were all received from the appellees, as due to them under the will, which, as far as they are concerned, estops them from denying the legality of such investments; and that, in a case like this, in the absence of all *mala fides* on the part of such *cestui que trusts*, and the appellees, and either of them, such conduct and acts on the part of the *cestui que trusts* for life, equally protect the appellees from all claim on the part of the *cestui que trusts*, in remainder for any loss sustained, in fact, afterwards, from the investment.

5th. For the reasons stated in the 4th point, it not being pretended that the said *cestui que trusts* for life, or any other person interested in the said trust estate, applied to the appellees to dispose of said investment, on the ground that it was becoming, or likely to become, a losing one, the appellees are not responsible for the eventual loss, if they acted and continued to hold the stock in good faith, as it is admitted they did.

MAGRUDER, J., dissented, and delivered the following opinion :

In dissenting from the opinion of the majority of the court, I do not wish to be understood, as subscribing to all the legal positions which were taken by the counsel for the appellants. I may say, however, that there are points, of which I do not mean here to take notice, which I would rather should become the settled law of *Maryland* without, than by, my agency. Trustees are safe, when they act in the execution of the trust, by the advice of the chancellor, and his directions in regard to the investment or reinvestment of the trust fund, they might at any time have obtained. Indeed, I am unable to say that these trustees were quite safe in any act that was required of them, without the sanction of the chancellor. They proposed to invest the trust fund in the stock of a bank, whose charter was to expire before the trust was to be distributed, a step which, when it can, ought to be avoided.

But still I will not say, that for the original investment, without any application to the court of chancery, they can be condemned. When, however, the charter of the *United States Bank* was about to expire, and the question was to be decided, in what other stock this investment was to be made, there was no law which authorised them to constitute *N. Biddle* their attorney, and surrender to him all the powers which the will gave to the trustees, and the law gives to the court of chancery. He, *(Biddle,)* was to act in person or by attorney, and, in person or by attorney, decide for these *cestui que trusts*, whether this portion of the trust fund should be invested in a new bank, just about to be brought into existence, if the president of the old and the expected president of the new bank, should obtain of the old stockholders sufficient proxies to establish the State bank.

The power thus delegated to this attorney, is the power which the will that created the trust did not authorise them to delegate. An attention in person to their duties, may be attended with some inconvenience to the trustees, but this they undertake when they accept the trust, and, especially, when, by their own act, in making the investment in stock so far from them, it becomes necessary for them to submit to that inconvenience. Had they attended in person, and exercised their own judgment, it is difficult to say what might have been their decision, but it may reasonably be expected, that they would have considered it their duty to recall the power of attorney, when they heard their own agent urge as a reason for the investment of all the stock, even the stock held by citizens in *Maryland* in the new bank, because, "although it could, doubtless, have obtained a charter elsewhere, on much lower terms, yet it would have been an exile, instead of continuing to be, what it has been forty years, a bank of the *United States, at Philadelphia*. Again, the question to retain, (in *Pennsylvania*,) an existing capital, which would leave the State, and not merely leave the State, but go into the service of its neighbors to make rival improvements to its own. Here it is already collected in the State, belonging mainly to persons

53      v.8

out of the State, but left here to be managed by *Pennsylvanians,* and for the benefit of *Pennsylvania.''* Surely these and other remarks made to the stockholders, when assembled, would not have been heard, if proxies had not been so liberally granted by distant stockholders to the author of them.

Such an agent could scarcely be deemed a faithful agent, to be entrusted with such powers by trustees living out of the State, and acting for others, residents elsewhere. It is not believed that the chancellor, if he had been consulted, and seen the remarks of the agent, which are made, by consent, a part of the evidence in this case, would have considered himself at liberty to continue this trust fund in an institution, under the management of this agent, and with the avowed purpose of appropriating to its own *(Pennsylvania's,)* exclusive use, a vast amount of capital.

I have heretofore been induced to think, that I was, perhaps, rather disposed to act with too much lenity, when judging of the conduct of trustees, and determining their liability. I certainly have not thought favorably of every thing that I have read in regard thereto in the *English* books, and sometimes, (especially when counsel for the unsuccessful party,) have questioned the correctness of some things said occasionally by this court. But certainly, (especially since the case of *Ringgold and Ringgold,* 1 *H. & G.,* 11,) have never supposed that trustees, acting as these trustees are proved to have acted, could rightly insist, that losses thus sustained, must be sustained by innocent and confiding *cestui que trusts.*

In the case of *Ringgold and Ringgold,* 1 *H. & G.,* 11, both the chancellor and this court spoke of those trustees who *do not* act, *'' bona fide,* within trust limits.'' '' But when the trustee'' said the chancellor '' transcends his limits, then he becomes responsible for the utmost value of the funds thus misapplied.'' The line of duty must be strictly pursued, no part of the property must be put within the control of persons who ought not to be entrusted with it. If he does and a loss be thereby incurred, such personal representative will be liable to make it good, however unexpected the result, however little likely to

arise from the course adopted, and however free such conduct may have been from improper motive. *2nd Spence Equity Jurisdiction*, 934.

As, however, a majority of the court have come to the conclusion, that these trustees are not to be accountable for the appointment of an agent, when not authorised to appoint him, and for the loss sustained by the trust fund, by reason of his acts, I shall not give more in detail my reasons for thinking otherwise. I must, however, think, that the loss here to be sustained, ought to be borne by men who undertook the trust, and then transcended the bounds of their trust duty; who conferred upon an individual, whom they were not authorised to employ, all the powers which the will gave to them, and which the law confides to the chancellor.

DORSEY, C. J., delivered the opinion of this court.

The only matters in controversy in the case before us, relate to the liability of the trustees, the defendants, for the amount of the loss sustained by the trust fund, by reason of the defendants, on the 10th of February, 1836, having united with the other stockholders of the old *Bank of the United States*, in the acceptance of the charter of the new *Bank of the United States*, incorporated by the State of *Pennsylvania*, on the 18th of February 1836, and surrendering two hundred and twenty-one shares of the capital stock of the old bank, (which was held by them as their investment of part of the trust fund,) and accepting, in lieu thereof, two hundred and twenty-one shares of stock of the new *Bank of the United States*.

From the nature of the complainants' bill, the trustees had no right to anticipate, in reference to this bank stock, any charges against them of negligence, misconduct, want of judgment and discretion, or violation of duty, or transgression of their powers; or that at the time of the acceptance of the charter of the new bank, its substituted stock for that of the old bank, was not to be deemed an investment in "safe and profitable stock," as directed by the will of the testator, whether it were to be regarded as an entirely new investment, or as a

*quasi* continuation of the old one. No such charges having been made in the bill, the defendant trustees, have been deprived of the benefit, which a denial or explanation in their answer would have given them. Indeed, looking only to the allegations in the bill, it might have been fairly concluded, that to this investment in the stock of the new *Bank of the United States*, the complainants designed to take no exception. Into such a quiescent inference the defendants might very naturally have been lulled, and if it were necessary to do so for their protection, this court might well require stronger and more conclusive proof on the part of the complainants, to entitle them to the relief claimed for them in the argument before us, than would have been demanded of them, had their bill, with the customary fullness and fairness, disclosed to the defendants the nature and grounds of the claim to which they were called upon to respond. Let it not be supposed for a moment, (for nothing is further from our opinion upon the subject,) that there was any sinister design in thus framing the bill, but we merely refer to it as, in its tendency, indicating to the defendants, that its object was to seek relief for different grievances than those now urged before this court. The trustees being the only defendants in interest, when the term defendants is used, the trustees only are embraced by it.

In the course of the argument of the various points relied on in this case, to charge the defendants with the loss complained of, an immense mass, both of *English* and *American*, authorities have been referred to, to prove that in the States or country where those decisions were made, an investment of a trust fund by executors, guardians or trustees, in bank stock, was a breach of trust, and subjected those by whom it was made to all the losses and casualties resulting therefrom. In answer to these authorities, it might perhaps be sufficient to say, that the *English* chancery rule, in regard to the securities in which trust funds can only be legitimately invested, has never literally, nor analogically, been extended to *Maryland;* and that the *American* authorities cited, for the most part, depend on statutory enactments of the States in which those decisions have

been made, or rest on principles sanctioned by the courts of those States, but which have never been adopted, directly or indirectly, in the State of *Maryland;* and we do not think it would be doing justice to the chancery court, or the parties in this cause, even if there existed no other reason for its refraining to do so, for this appellate tribunal now, for the first time, to establish a new rule upon the subject, designed to control not only the future action of the judicial tribunals of this State, but which might invalidate transactions almost without number, the legality of which heretofore had never been doubted, and might create liabilities never before dreamed of, to an amount of which this court cannot form even a conjectural estimate.

But this court is withheld from adopting the principle contended for by the appellant, upon other and sufficient grounds. It is a matter of notoriety, a part of the public history of such transactions in *Maryland*, that trustees, &c., holding funds directed to be invested in stocks, have been in the habit of making such investments in bank stock, and especially in the stock of the *Bank of the United States*, when such an institution was in existence. And if such usage had never existed before, in the absence of express legislation upon the subject, its commencement would have been analogically justified by the fourth and fifth sections of the act of 1831, ch. 315, which enact: " That the orphans courts of the several counties in this State, be, and they are hereby authorised and empowered, in their discretion, and whenever to them it shall seem proper, either *ex officio* or upon application, to order any executor or administrator, to whom they may have granted letters testamentary or of administration, to bring into court, or place in bank, or invest in bank stock, or in any other good security, any money or funds received by such executor or administrator." And the same authority, in the same terms, is given to the orphans court in respect to money or funds in the hands of guardians. With a knowledge of the usage, as to investments of trust funds in bank stocks, and these provisions of the act of 1831 before us, to hold trustees liable for all the losses that

may occur, solely on the ground that they had made an invest-
ment of the trust fund in bank stock, would, in *Maryland,* be
an act of extreme rigor, not to say of injustice towards them,
which this court cannot be induced to perpetrate.    But, as
conclusive evidence, to show that in *Maryland* no such rule
exists as that contained in the authorities cited, by which bank
stock is repudiated as a security, in which trust funds may be
lawfully invested, the opinion of *Chancellor Bland,* to be found
in *Hammond vs. Hammond,* 2 *Bland,* 412 *and* 413, may be
confidently relied on.    He, with a diligence worthy of all com-
mendation, had examined into all the rules, practice and deci-
sions of his predecessors in office, and designing, as we cannot
doubt, not to depart therefrom, delivered his opinion in the
case referred to, from which the following is an extract:  "'The
meaning of the phrase, 'good security,' used by the testator,
must be taken in connection with that indefinite and, perhaps,
great length of time, during which, it is very evident, he in-
tended it should be 'good security;' and thus understanding
the testator to mean, permanently and durably, good security,
I feel my discretion must be limited to a selection among secur-
ities of that description, that is, government stock, or a mort-
gage on unincumbered real estate, or *good bank stock.*"

The complainants insist, that the trustees, *Lynch* and *McDo-
nald,* ought to be "held personally responsible for the amount
of money or the value of the stock in the *National Bank,* so
by them illegally converted, by taking stock in the State bank,
(meaning the new *Bank of the United States,*) together with
interest on said amount," on six separate grounds.    The first
of which is, "because the power to invest, by the terms of the
will, is to '*James Campbell, Edmund Lynch* and *Samuel
McDonald,*" *nominatim,* and they are to hold the said invest-
ment in trust, &c., and therefore the power did not extend to
*Lynch* and *McDonald,* the survivors, by whom the investment
complained of was made."    To sustain this position, an im-
mense number of authorities has been referred to, the force of
which it would be difficult to obviate, were the case before us
one of a mere naked power, and not of a power coupled with

an interest or trust. From the nature, objects and provisions of the will, apart from all authorities on the subject, we think it might be satisfactorily shown, that it was the intention of the testator that the powers given to the trustees, should, upon the death of one of them, enure to the survivors. But, from the necessity of proving such intention apparent upon the face of the will, we are relieved by the conclusiveness of the numerous authorities, settling against them the principle for which the appellants contend, a reference to which is the only answer that need be given to their argument upon the subject.

In *Franklin vs. Osgood*, 14 *John.*, 527, it was held, that "where the power, *per se*, is merely a naked power, and yet in other parts of the will, there are trusts and duties imposed upon the executors which require a sale to be made, in order to effectuate the intent of the testator, in such case the power survives." In *Taylor, et al., vs. Benham*, 5 *Howard*, 233: "A power to sell, coupled either with an interest or trust, survives to the surviving executor. So also if all the trustees or executors in such a case decline to act except one." In *Peter vs. Beverly*, 10 *Peters*, 532: "The general principle of the common law, as laid down by *Lord Coke*, and sanctioned by many judicial decisions, is, that when the power given to several persons, is the mere naked power to sell, not coupled with an interest, it must be executed by all, and does not survive. But where the power is coupled with an interest, it may be executed by the survivor. It is not a power coupled with an interest in executors, because they may derive a personal benefit from the devise. For a trust will survive, though no way beneficial to the trustee. It is the possession of the legal estate, or a right in the subject over which the power is to be exercised, that make the interest in question." "And where there is a trust charged upon the executors in the direction given to them in the disposition of the proceeds, it is the settled doctrine of courts of chancery, that the trust does not become extinct by the death of one of the trustees. It will be continued in the survivors, and not be permitted, in any event, to fail for the want of a trustee." That the power given to the trustees in

this case was coupled both with an interest and a trust, nobody who reads the will can entertain one moment's doubt. In *Lewin on Trusts*, 266, it is stated, that "on the death of one trustee, the joint office survives." And, "it is a well known maxim, that a bare authority, committed to several persons, is determined by the death of any one, but if coupled with an interest, it passes to the survivors." "It follows, that as co-trustees have an authority coupled with an interest, their office must be impressed with the quality of survivorship; as if an estate be vested in two trustees, upon trust to sell, and one of them dies, the other may sell; otherwise, indeed, the more precaution a person took by increasing the number of trustees, the greater would be the chance of the abrupt determination of the trust by the death of any one." In *Hill on Trustees*, 303, it is said: "Where more trustees than one are appointed, the trust property is almost invariably limited to them as joint tenants; and even if the terms of the gift rendered this at all doubtful, the court, for sake of convenience, would doubtless endeavor, if possible, to affix this construction to it." "Therefore, upon the death of one of the original trustees, the whole estate, whether real or personal, devolves upon the survivors, and so on continually to the last survivor." Many other similar authorities might be referred to, but too much has already been said on so plain a proposition, and but for the apparent confidence with which it was denied, its announcement by the court would have been all that would have been deemed necessary for its establishment.

But, it is said, conceding the principle of survivorship in relation to such cases, apart from all legislation upon the subject, yet that the principles of joint tenancy are wholly abrogated by the act of 1822, ch. 162. All that need be said in answer thereto is, that this act of Assembly was not intended to apply to devises or grants made to trustees for the benefit of third persons. Survivorship in such cases, formed no part of the evil designed to be remedied, and not being within the intent or spirit of the act, is not embraced by it.

The second ground upon which the appellant claims a reversal of the chancellor's decree is, "because conceding even that the power survives, still, in this case, it was exhausted by the first investment, and there being no power to reinvest, it required the sanction of chancery, notwithstanding the temporary and limited duration of the first investment." This restrictive construction of the powers of the trustees, we think wholly inconsistent with the intention of the testator, collected from the provisions of the will itself. If the investments first made, without any default on the part of the trustees, returned, or were about to be returned, to their hands in money, and there to remain unproductive, but by a reinvestment, it would have been in them a breach of duty, by clear implication, imposed upon them by the manifest intention of the testator, not to have made provision for such a reinvestment. The acts of the trustees here complained of, ought not to be regarded as a new or reinvestment of a portion of the testator's estate, of which a previous investment had been made, but rather as efforts of the trustees, designed to preserve and protect the original investment, and to keep it, as nearly as practicable, in its primitive condition. To suppose that the testator intended to withhold such authority from his trustees, is to impute to him a degree of folly, distrust and inconsistency, for which the provisions of his will furnish not the slightest warrant.

But, suppose it be conceded that this substitution of the stock of the old for the stock of the new *Bank of the United States,* was an original investment, which the trustees were, strictly speaking, not authorised to make without the sanction of the chancery court. Can a doubt be entertained, looking to the proof in the cause, the agreements of the parties, admitting the truth of all that is said upon the subject in the answer of the appellees, in connection with the fact that every stockholder of the old *Bank of the United States* assented to the substitution, (except the *United States,* which acted upon principles foreign to those of all other stockholders,) that a court of equity, if applied to by the trustees at the time, would have sanctioned the investment? We think such a doubt cannot rationally be

54    v.8

entertained.   It is a settled rule in chancery, that where a
trustee does, without an application to the court, an act which
would have been ordered, if authority for that purpose had
been previously applied for, and at the time of the act being
done, it was obviously for the benefit of all concerned, such
act will be ratified and affirmed, and held of the same validity
as if it had emanated from the previous order of the chancellor.
The second ground, therefore, relied on by the appellants, can
avail them nothing towards reversing the decree of the chan-
cellor.

Their third ground is, "because regarded as a question of
extent of power, it was a power only to invest in some already
existing stock, and not a power to create a new and speculative
stock, as has been attempted in this case, by taking stock in
the *Pennsylvania Bank*." For this limitation on the judg-
ment and discretion of the trustees, we see no warrant in the
will, and therefore are not disposed to adopt it.   Suppose such
a will were of recent date, with all the funds ready for invest-
ment in the hands of the trustees, and Congress were now to
incorporate for fifty years a new *Bank of the United States*,
with far more beneficial and extended powers than those pos-
sessed by the late bank, could it be gravely urged, that as an
investment, they could not subscribe for stock in such bank?
We think not.   If the trustees had no such power, it could
not be communicated to them by any sanction given by the
chancery court.

The fourth ground is, "because, even on the hypothesis
that the trustees did not exceed their powers, yet it was a gross
abuse of power for these trustees to travel out of the State of
*Maryland*, to create a new State bank under the authority of
the legislature of *Pennsylvania*, predicated, as that bank was,
upon principles and sacrifices of capital hitherto unknown in
the history of such local banks, and in support of this view,
we refer to the charter in evidence, and the statements of
*Nicholas Biddle*, also in evidence, made at the meeting of
stockholders." The power in the trustees to make the invest-
ment being conceded, the residue of the objection to it is irre-

futably answered by the controlling circumstances under which it was made, by the admitted facts in relation to it contained in the answer, and by the overwhelming fact, that every other stockholder in the old bank made a like investment, the *United States* excepted, which declined doing so for reasons not applicable to other stockholders.

The appellants fifth ground is, "because the facts agreed show, that in making the investment complained of, the trustees did not act on their own personal judgment and discretion, but undertook beforehand to delegate all their discretion and judgment to *Nicholas Biddle* by the power of attorney, exhibited in the record, which, as practically carried out, devolved the trust to a stranger, under whose substituted agency this investment was made, thus depriving the *cestuis que trust* of that personal judgment and discretion of the trustees which was required of them by duty and law, and which, under these circumstances, they cannot now invoke as their protection in this disastrous investment." In the argument on behalf of the appellants it was insisted, that to determine on the expediency of surrendering the stock in the old bank, and accepting in lieu thereof the same number of shares in the new bank, required both judgment and discretion, after a full examination of the affairs and condition of the old bank, if compelled to wind up its affairs on the expiration of its charter. That to enable the trustees to decide on the propriety of the course they were about to pursue, it was their indispensable duty to visit the mother bank at the city of *Philadelphia*, and minutely examine into its concerns, and meet in consultation with the other stockholders, before giving their assent to the conversion of their stock in the old, into the stock of the new bank of the *United States.*

If such were the indispensable duty of trustees holding stock in the old *Bank of the United States*, it would attach as well to trustees residing in *New Orleans, California, London,* or the most remote quarter of the world, as to those resident in *Baltimore.* And the obligation is equally imperative, whether the fund in trust be large or small in amount, and all the trus-

tees are equally bound to discharge this duty, whether the number be one or twenty, because trustees can no more delegate their powers to each other, than they can to a stranger.   It cannot be denied, that the trustees would be entitled to reimbursement, out of the trust fund, for their expenses thus incurred in the discharge of their duties.   And should the trust fund be small, it might be wholly consumed in the expenses of the trustees.   And *cui bono* would such waste of time and money be incurred?   Would the officers of the bank throw open to their inspection its vaults, count its specie, exhibit its bills, bonds, notes and other securities, and submit to their examination all the bank accounts of its customers and officers?   Certainly not.   But, suppose they had done so, would the object of their investigation be obtained?   It cannot be pretended that it would.   The trustees, to obtain that reliable information, which would warrant the exercise of their judgment and discretion, according to the requisitions of the appellants, must perform a pilgrimage to every State in the Union, in which a branch might be located, and there pursue, with respect to it, a similar process of investigation, and to be consistent, they must visit and investigate the accounts and transactions of the agencies of the bank in every part of the commercial world.   And to form any satisfactory basis for themselves, on which to rest the exertion of their discretion and judgment, in addition to the aforementioned examinations, they must inquire into the ability of all the debtors of the bank, in every part of the world, to pay their debts; and, when all this has been accomplished, it might safely be asserted, that there is not one trustee in five hundred, whose opinion, being the result of his own investigations, could be as safely followed as that of him who formed it exclusively upon a perusal of the stock price current of the day.

But if such extraordinary investigations are necessarily to be made by trustees, before they are authorised to sell or exchange bank stock, when a part of a trust fund, can any sufficient reason be assigned, why similar investigations are not indispensably prerequisite to the security of trustees investing trust funds

in bank stock? In neither case do we regard them as necessary for the protection of trustees, who faithfully, and with ordinary skill and judgment, discharge the duties of their office.

The liabilities of trustees are not created or measured by the unexecuted powers which they may have conferred on their delegate or attorney, but by the powers which he has executed. In their acceptance of the charter of the new bank, and investing in the stock thereof the shares of stock which they held in the old bank, we have before stated that the trustees were justified, and whether such acceptance and investment were made by themselves, in person, or by their delegate or attorney, is, therefore, wholly immaterial. We do not, however, regard the case before us as one in which the trustees, without having exercised their own judgment and discretion in deciding on the expediency of the acts to be done, had transferred their entire powers to their agent or attorney, but a case in which the trustees, having fully exercised their judgment and discretion, with fidelity and reasonable prudence and judgment, authorised their agent, *Nicholas Biddle,* ministerially to do what was necessary to effectuate their determination; at the same time clothing him with a *quasi* veto power over the acts they had authorised him to consummate. This veto power not being exerted, whether it were rightfully conferred or not, is not a question before us.

The sixth point, relied on by the appellants, as a ground on which the decree of the chancellor should be reversed, is, "because the evidence shows that the stock taken in the *State Bank of Pennsylvania,* ceased to pay dividends in July, 1839, and after that date, underwent a fixed and gradual decline through a series of months, until it depreciated to a mere nominal value, during all which time the trustees took no action to protect the interests of the *cestuis que trust,* and have thus, by gross laches, charged themselves with the full amount of loss to the trust fund." However much the authorities may differ, as to the nature of the discretion and the degree of diligence which is required of the trustees in the management of the trust fund, before its investment, there seems little or no diversity of opinion as to the degree of negligence or misconduct which is requisite

personally to charge trustees, after the trust funds have been properly invested. In *Pybus vs. Smith*, 1 *Ves.*, *Jr.*, 193, the lord chancellor says: "You cannot affect the trustees with more than they actually received, without wilful default." In *Jackson vs. Jackson*, 1 *Atk.*, 514: "To compel trustees to make up a deficiency, not owing to their wilful default, is the harshest demand that can be made in a court of equity." In *Willis on Trustees*, 168, it is stated, and the authorities referred to, on which the statement is founded, "that trustees must execute their trusts faithfully, according to the terms of them, and the intention of the parties by whom the trusts have been created; and that it will be presumed that the trustees have done so, unless the contrary clearly and unequivocally appears." In *Thompson vs. Brown*, 4 *John. C. R.*, 628, *Chancellor Kent* says: "This court have always treated trustees, acting in good faith, with great tenderness." And he then quotes, with approbation, from the opinion of *Lord Hardwicke*, in *Knight vs. The Earl of Plymouth*, 1 *Dickens*, 126: "A trustee having in his hands a considerable sum of money, places it out for the benefit of the *cestui que trust*, in the funds which afterwards sink in their value, or on a security, at the time apparently good, and which afterwards turns out not to be so, was there ever an instance of the trustees being made to answer for the actual sum so placed out? I answer no. If there was no *mala fides*, nothing wilful in the conduct of the trustee, the court will always favor him. For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it. To add hazard or risk to that trouble, and to subject a trustee to losses, which he could not foresee, would be a manifest hardship, and would be deterring every one from accepting so necessary an office." In *Massey vs. Banner*, 1 *Jac. & Walk.*, 241, *Lord Eldon* says: "Trustees, agents, &c., are expected to take the same care of the trust funds as a reasonable attention to their own affairs would dictate to them to take of their own property." "The degree of neglect to be made

out for any sum beyond that actually received, is also different and greater.'' When the trustee is made liable for more, it must be, in the language of the books, ''in cases of very supine or wilful default.'' It is stated by *Chancellor Kent*, in *Osgood vs. Franklin, 2 John. C. R.*, 1: ''A trustee is not chargeable with more than he has received of the trust estate, unless there is evidence of very gross negligence, amounting to wilful default.'' The Supreme Court of the *United States* announce the same principle in *Taylor, et al., vs. Benham, 5 Howard,* 233: '' But the executor is not responsible for more money than he received, with interest, unless in case of very supine negligence, or wilful default.'' In *Hill on Trustee*, 381, the unquestioned principle is stated, that '' where the trust moneys are once properly invested in stock, the trustees cannot, without an express authority, dispose of the stock, and invest in other securities.'' *Justice Story*, after examining various decisions made in the chancery court of *England*, in regard to liabilities of trustees, and the grounds upon which they are founded, says: '' The true result of the considerations here suggested, would seem to be, that where a trustee has acted with good faith in the exercise of a fair discretion, and in the same manner as he would ordinarily do in regard to his own perperty, he ought not to be held responsible for any losses accruing in the management of the trust property.''

Upon a fair application of the principles sustained by the authorities referred to, to the conduct of the trustees, as presented in the record, ought the chancellor's decree to be reversed, for the reasons assigned in the sixth ground relied on for its reversal? The trustees have been guilty of no supine negligence, or wilful default. They, or at least one of them, (and there is no evidence of any diversity of opinion between them upon the subject,) have acted, in the management of the trust fund, in the same way that they have deemed it advisable to act with regard to their own property of the same kind. Although they could, *ad libitum*, have sold the stock held by one of them, yet it was not deemed expedient or advantageous to do so. Whereas, they possessed no power to sell the bank stock held

in trust; the *cestuis que trust* were legally incompetent to assent to such sale. The only means by which the trustees could have obtained a power to sell, would have been by filing a bill in chancery for that purpose, against the *cestuis que trust*, whose assent to it they could have had, but extremely faint, if any hopes of obtaining, judging from past transactions between them, which are detailed in the record before us; and that the chancellor, without such assent, would have decreed the sale, is, to say the least of it, quite problematical.

*Mrs. Gray* was, it appears, a widow in 1840, whose administratrix as such, is one of the complainants; and yet, during the four years that she remained a widow, cognizant of all the facts in relation to this stock, it does not appear that she ever applied to the court of chancery herself, or requested the trustees to do so, to obtain for the trustees an authority to sell. Nor is it literally true, that after July, 1839, the stock " underwent a fixed and gradual decline through a series of months, until it depreciated to a mere nominal value " According to the statement of prices at which the stock sold in *Philadelphia*, which, by agreement, is evidence before us, the decline in price was not fixed and gradual, but the price continued to fluctuate, sometimes rising and sometimes falling. In the month of October, 1839, the price of stock advanced $16 per share, in the course of five days. The trustees, therefore, who could only judge of its value by the price it bore in the stock market, cannot be charged with supine neglect, or wilful default, because they were unable to determine that, at any particular time, a sale of the stock would be advantageous to the *cestuis que trust*, much less that it would be so at the time when a decree for that purpose could be obtained from the court of chancery. On the contrary, the trustees have, in their answer, denied all neglect or default on their part, and most positively averred that they acted with fidelity, according to the best of their judgment and discretion, and with a view to promote the interest and benefit of the *cestuis que trust*. It appears, also, that one of the trustees held, in his own right, a larger amount of the stock of the new *Bank of the United States*, than that held in trust;

that he acquired title thereto in the same way, and has ever since continued the holder thereof. All these facts, and every thing stated in the answer, in relation to the stock of the bank, (except that the *cestuis que trust* approved of the substituted investment,) are, by agreement of the parties, admitted to be true. A court which, under all these circumstances, could charge the appellees with the claim now preferred against them, we must be excused for saying, would rather deserve any other name than a court of equity.

The decree of the chancery court is affirmed with costs, both in this court and in the court of chancery.

DECREE AFFIRMED.