# EUGENE ZIMMERMAN *v.* EMORY L. COBLENTZ ET AL.

[No. 6, April Term, 1936]

*Decided June 9th, 1936.*

The cause was argued before BOND, C. J., and OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Charles E. Moylan* and *Michael Paul Smith*, with whom were *Theodore McKeldin* and *John J. Fitzpatrick* on the brief, for the appellant.

*Washington Bowie, Jr.*, and *William M. Storm*, with whom was *Leslie N. Coblentz* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

The appellant in this case, now twenty-two years of age, and entitled to receive a distributive share of an estate upon reaching twenty-five years, complains that by breaches of trust by executors or trustees of the fund, in depositing it and keeping it on deposit in the Central Trust Company of Frederick, now in the hands of the bank commissioner as receiver, it has been lost; and he prays that they be required to make restitution, and be personally charged with the amount. There is no dispute of the trust, or of the amount of money, $28,719.39, belonging to it and lost. The suit is solely one to charge the appellees with the loss by reason of a breach of their

duty. The Circuit Court failed to find sufficient ground for the charge, and dismissed the bill of complaint.

The trust arose under the will of a Cephas M. Thomas, late of Frederick County, who died in 1919. The residuary estate of the testator was bequeathed to Donald T. Zimmerman, Madeleine N. Zimmerman, and Eugene Zimmerman, children of Daisy T. Zimmerman, " to be divided among them equally share and share alike and to be paid to them when and as they respectively arrive at the age of twenty-five years," with contingent limitations over. The interest on each share was to be invested annually, and constitute a part of the corpus of the trust fund, until the particular child should reach twenty-one years of age, and during the four remaining years was to be paid over to the child. And power was given to use parts of the fund or the interest, if needed, for the maintenance, education, and support of the children before they should reach the age of twenty-one. No trustee or trustees were named in the residuary clause. It was followed by a clause appointing George H. Thomas and Emory L. Coblentz executors of the will, and a codicil substituted Newton A. Fulton in the place of Mr. Thomas.

The executors filed their first and final account of their administration in the Orphans' Court on May 9th, 1921, and it was on that day duly approved. Thereafter, they continued in the management of the trust under the residuary clause, assuming that this was the intention of the will. And in the year 1925, proceeding as executors and as "executory trustees," as they stated, they prayed that the court of equity assume jurisdiction of the administration of the trust. Code, art. 93, sec. 10. And the oldest of the children being then about to arrive at the age of twenty-five years, they sought and obtained the authority of the court to sell securities and real property received in the estate, all then marketable at a premium, in order to have cash to distribute exactly equal amounts as the respective children should reach the specified age. The results of the sales were duly

accounted for, along with expenditures made for the support of the children and otherwise. A petition filed on May 24th, 1926, further reported the amount then to be paid the oldest child, and the amounts to be retained for payment of the other two, and prayed authority of the court to invest these retained trust funds for the use and profit of the beneficiaries by depositing them in the Walkersville Savings Bank at Walkersville, in the same county, at four per cent. interest, subject to the further order of the court. The testator, Thomas, had been president of that bank, and Newton A. Fulton, of the defendants, became president later.

The second Zimmerman child, Madeleine, reached the age of twenty-five years on June 1st, 1926, and was paid her share later.

On May 14th, 1930, the Central Trust Company, of which Emory L. Coblentz, one of the executors, was president, and had been president since its organization in 1913, purchased the assets and assumed the liabilities of the Walkersville Savings Bank, and continued that bank as a branch of the trust company. The charter and legal existence of the Savings Bank, and the business carried on by it, remained undisturbed. But all deposits were taken over and mingled as deposits of the trust company. No authority for continuing the fund held for Eugene Zimmerman on deposit under the changed circumstances was sought or given. On the evidence the question of necessity for it appears to have been overlooked. The executors relied upon counsel to advise them in performance of the trust, and counsel did not raise any question of necessity of approval by the court. Making the change without that approval is one of the grounds of the charge of breach of trust.

The parties have argued a question of the character in which the appellees so continued to hold the fund after they had rendered their final account in the orphans' court of the administration of the estate; whether they held as executors awaiting distribution, or in a second capacity, as trustees and distributees, under

the principle that when the same persons are made executors and also legatees, whether as trustees or otherwise, there will be a transfer by operation of law to them in the second capacity after the administration in the orphans' court has been concluded. *State v. Jordan*, 3 H. & McH. 179; *Downes v. State*, 3 H. & J. 239; *Seegar's Excrs. v. State*, 6 H. & J. 162; *Boyd v. Boyd*, 6 G. & J. 25, 33; *Flickinger v. Hull*, 5 Gill, 60, 74; *Tilly v. Tilly*, 2 Bland, 436, 445; *In re Estate of Williams*, 1 Md.Ch. 25; *Lark v. Linstead*, 2 Md.Ch. 162; *Conner v. Ogle*, 4 Md.Ch. 425, 448; *Hanson v. Worthington*, 12 Md. 418, 440; *Sparks v. Weedon*, 21 Md. 156; *State, use of Gable, v. Cheston*, 51 Md. 352; *Webb v. Webb*, 92 Md. 101, 48 A. 95; *Philbin v. Thurn*, 103 Md. 342, 63 A. 571; *Coudon v. Updegraf*, 117 Md. 71, 83 A. 145. To the operation of that principle it is, of course, necessary that the executors be placed in the second position, that of the legatees, so that they may be transferees after the closing of the administration. A will may extend duties of distribution by executors, in that unaltered capacity, to a distant date. Code, art. 93, sec. 10. In *Keplinger v. Maccubbin*, 58 Md. 203, it was found that executors were required to sell upon the termination of intervening interests fifty-two years after the testator's death. On the other hand, failure of the will to specify a second capacity in which the fund is to be held, trustees, guardians, or legatees of any other character, will not always continue the office of executors; a trust or other second holding may be made clear without explicit declaration. In *Hindman v. State*, 61 Md. 471, a bequest of money to a grandson, to be paid him at the age of twenty-one, interest in the meantime to be paid to daughters of the testator, without designation of any person to invest the fund and collect and pay over the interest, was held to impose those duties on the executors. And see *State v. Robinson*, 57 Md. 486; *Smith v. Michael*, 113 Md. 10, 77 A. 282. In another case, a bequest of a trust to executors by that description was held to result in a transfer to them in their second capacity upon settlement of the

administration of the estate. "It is equally well settled in this state that the orphans' court has no jurisdiction of the administration of a trust created by a will." *Coudon v. Updegraf*, 117 Md. 71, 75, 83 A. 145, 147. In *Webb v. Webb*, 92 Md. 101, 48 A. 95, executors were found to have assented to an order of court that they should hold as trustees, and had given bond as such; and these facts concluded the question of their capacity.

The will in this case repeatedly speaks of the fund as a trust fund to be administered as described, and the executors repeatedly refer to themselves as trustees, or as holding and administering a trust. But the duties were such as might be included in the duties of a deferred distribution by executors, or in those of trustees by that name, indifferently. They were similar to those found imposed upon executors in *Hindman v. State*, 61 Md. 471, and other cases cited above, and are commonly found intrusted to trustees. *Coudon v. Updegraf*, 117 Md. 71, 83 A. 145. No other than the executors having been designated in this will, and the executors having in that capacity had the court assume jurisdiction of the performance of the duties, this court concludes that the holding should be considered as that of executors.

Holding a trust fund in the form of a general bank deposit is always undesirable, except as a temporary expedient, because as the money is mingled with that of other depositors, leaving the trust only a simple debt of the bank, equivalent to that on a loan without security, it lacks the assurance of safety which should be secured for trust funds, and which would be secured by investments owned by the trust exclusively. 1 *Am.L. Inst. Restatement, Trusts*, sec. 180d; *Strauss v. United States Fid. & Guar. Co.* (C.C.A.) 63 Fed. (2nd) 174; *Whitecar's Estate*, 147 Pa. 368, 23 A. 575; *Barney v. Saunders*, 16 How. 535, 545, 14 L.Ed. 1047; *Fenwick v. Clarke*, 4 De Gex., F. & J. 240; 3 *Bogert, Trusts & Trustees*, sec. 598; *Carey v. Safe Dep. & Trust Co.*, 168 Md. 501, 178 A. 242. And of course increase of risk in a particular case requires increase of care. The continuation

of this deposit after it had been taken over by the trust company in 1930, although it is a truth often overlooked, amounted to a removal of the fund from the depositary authorized by the court, and involved a new set of risks. Depositors in savings banks have special statutory protections. Code, art. 11, secs. 32 to 39. The loss of the benefit of one safeguard, that from the prohibition of loans to officers, directors, or employees, proved to be of importance in this instance. As there was no further division of the fund to be made after the second child had received her distributive share in 1926, the reason for placing the fund on deposit originally had ceased to exist. Equality in distribution did not require that the last, single share be kept in the form of a money obligation, of the same value to the dollar, during the next twelve years, while awaiting the distributee's arrival at the age of payment. On the other hand, savings departments in trust companies are common depositaries of savings, and, given the decision that the funds were to be deposited, it would not have been unusual to select a depositary of that sort. 3 *Bogert, Trusts and Trustees,* sec. 680. And while it was the duty of the executors to decline the alteration in their deposit without an order of court, it cannot be said that the court should not have authorized acceptance at that time. In their opinion in the case the judges of the Circuit Court have declared that they would have approved acceptance of the change if application had been made then. *McCrory v. Beeler,* 155 Md. 456, 461, 142 A. 587, *Johnson v. Webster,* 168, Md. 568, 575, 179 A. 831; *Reeside v. Peter,* 35 Md. 220, 221. Leaving aside the condition of this particular trust company as it was known to its officers, and considering only the question of the effect of failure of trustees to secure an order for continuation of a savings deposit as well in a savings department of a trust company as in a separate savings bank, the court concludes that in this alone there was no breach of the trust sufficient to require the executors to make restitution.

The continuation of the single share of Eugene Zim-

merman in the form of a bank deposit at all after 1926, when the second of three children had been paid her share, although it involved risk of it which was unnecessary, was nevertheless within the order signed by the judge then sitting as the Circuit Court, on the petition of the executors. That petition, presented a week before the time of payment due to the second child, the sister, recited the necessity of retaining the share of Eugene Zimmerman, as well as that of the sister, and prayed authority to invest it in a savings deposit, and the court's order directed that it be so deposited for the benefit of Eugene Zimmerman. And we conclude that there was no breach of trust, and restitution could not be required, because of the continuation. See *Gray v. Lynch,* 8 Gill, 403, 430; *Maennel v. Murdock,* 13 Md. 163.

But authority to invest in the specified form of security is not authority to continue the investment under all circumstances. On the contrary, there is a duty on a trustee to present to the court forthwith any known condition, or condition which reasonable watchfulness would discover, and which might render it advisable that the investment be changed, and obtain its further order. *Jones v. Stockett,* 2 Bland, 409, 426.

With respect to apprehension of danger from the condition of the company, the executor Fulton was, of course, in a position differing from that of his coexecutor, the president of the company. Fulton was president of the Walkersville Bank at the time of its taking over by the company, and he was continued in that position, but nominally only. He was not an officer of the trust company, which now held all the assets, and had no authority with respect even to the business of the Walkersville Bank as a branch. For his information as to the company's condition he was, as he said, left dependent upon the published statements, tested and approved as they were by state officials for the very purpose of protecting and giving assurance to depositors, and upon facts known generally; namely, that the trust company had a million dollars and more of capital, and that its

stock was selling at a good valuation. This would be a sufficient reliance for one not an officer or employee. It could not be required that he examine the bank for himself, or look for better protection in private information and assurances from trust company officials. *Gray v. Lynch*, 8 Gill, 403, 428. The examinations by the bank commissioner and his deputies had not included any investigation of values of unlisted securities, or securities of corporations outside the state, nor had it included any investigation of the conditions of corporations subsidiary to the trust company, but knowledge of those limitations would not come to any one not connected with the company, as Fulton was not. The conditions of the depositary, known to Coblentz and unknown to Fulton, are to be considered only in estimating the care of Coblentz, or the lack of it. Liability for a loss of funds in the hands of cotrustees, as a consequence of breach of trust by one, falls only on that one, unless the other has been guilty of collusion or culpable omission of duty with respect to the breach. *Glenn v. McKim*, 3 Gill, 366, 381; *Caldwell v. Graham*, 115 Md. 122, 129, 80 A. 839. The case is not one for liability on a trustee who delegates the performance of the trust entirely to his cotrustee, and by reason of the delegation is out of touch with conditions. *Maccubbin v. Cromwell's Excrs.*, 7 G.&J. 157, 168. The executor Coblentz here left the management of the trust to Fulton.

In considering the circumstances of the depositary, the court is not concerned precisely with determining whether it was at a given time solvent or insolvent. And it is not concerned to place blame for bringing dangerous conditions into existence, or for permitting them to develop. The inquiry is whether conditions exhibited to the one executor, however they may have arisen, were at any time before September 2nd, 1931, such as would then have moved a reasonably prudent man with the same knowledge to change the depositary or otherwise invest the fund, or to recommend that action to the court.

From the time of the organization of the company in 1913 to the spring of 1929, the capital stock had been in-

creased from $200,000 to $600,000, and the surplus to a total of $1,500,000, part of which had been paid in and part represented undivided profits. Throughout the last two years of the business the selling price of the stock was about $30 a share. Statements of the business published during that period showed that the deposits amounted to about $14,000,000. In addition to stocks and bonds, listed and unlisted, it held its money invested largely in notes of farmers of the surrounding country, and in real estate mortgages. About $5,500,000 was invested in second and third mortgages on office and apartment building property in Pittsburgh and Washington. At the beginning of September, 1929, the stock was increased to a total of $1,000,000; and in the early part of 1931 there was a final increase to $1,500,000, with added amounts subscribed for other purposes, as will be stated.

The evidence does not completely show the conditions of the company at any one time before its closing on September 2nd, 1931, or the development of the circumstances that led to the closing. Market values of much of the assets are not given. The meaning of some transactions is not made clear. As early as April of 1929, shortly after an issue of $200,000 new stock, the Cumberland Steel Company, which had been keeping a large amount of money on deposit in the trust company, at five per cent. interest, gave notice of a desire to withdraw $100,000, and the trust company replied that, because of the general tightness of money, and the very lean period it was passing through, this would be a hardship, and it would prefer to make an adjustment of interest payable on the deposit, offering a total return of seven per cent.

On September 4th, 1929, 40,000 additional shares of stock were issued, under an arrangement for a sale of them to Hambleton & Co., a firm of bankers of Baltimore. The price of $30 a share brought $1,200,000, and of this $400,000 was added to the capital, and $800,000 to surplus. It was made a condition of the purchase by Hambleton & Co. that some long-term securities, notes, and

stock, held by the company, be disposed of, or "worked out," and this was done by transferring them to subsidiary corporations formed for the purpose. A Central Securities Company was formed, its stock subscribed by stockholders of the trust company, and it took over securities of a value, apparently par value, of $2,250,000, with the market value not stated in the record, and paid for them by its note of $1,000,000 and 60,000 shares of its stock, which shares were then distributed to the trust company stockholders. The subtraction from capital which this involved was made up by paying in the $800,-000 mentioned from Hambleton & Co.'s purchase. On September 4th, 1929, another corporation, a Blue Ridge Securities Company, was formed, and Coblentz, taking its stock, turned over to it securities of his own to a value given by him of between $900,000 and $1,000,000. Then this new corporation took over the remainder of the trust company assets, of an aggregate value of $973,-225.85, which Hambleton & Co. and their auditors considered it necessary to dispose of. What actual market values these various securities had is not stated. The Blue Ridge Company pledged the securities with the trust company to secure notes given by it in payment.

Hambleton & Co. required also that a guaranty of assets should be obtained, and Coblentz and other individuals, directors, stockholders, or others interested in the company, entered into two agreements with the trust company and Hambleton & Co., dated September 25th, 1929, undertaking to pay the trust company one year from that date the unpaid balances of all of certain notes listed in the agreement, and to purchase at book values all of certain named securities then remaining unsold. The aggregate amount of the obligations undertaken exceeded at first $2,500,000, but this was reduced by a substitution of securities.

For reasons not made clear, the sale to Hambleton & Co. was short-lived, and in the latter part of 1929 the stock bought upon the conditions recited was bought back by the Blue Ridge Securities Company at an ad-

vanced price of $31.10 a share, or $1.10 a share more than paid by Hambleton & Co. according to the terms of their agreement. But the Blue Ridge Company never paid for all the shares. This sale to Hambleton & Co. is spoken of in part of the testimony as a pledge, but throughout the remainder of the testimony it is described as here stated.

In April, 1930, a Blue Ridge Investment Company, all the stock of which was taken by Coblentz, was formed to take over all the stock of the Blue Ridge Securities Company.

In the spring of 1930, the guarantors of the notes and securities formed a fourth subsidiary corporation, a Guarantors Investment Corporation, took over as a loan the assets guaranteed, gave its note to the trust company for them, and pledged the assets as collateral security. The guaranty agreement was not carried out on the date of payment.

The agreement for the acquisition of the Walkersville Savings Bank in the Spring of 1930 required a delivery of 15,000 shares of the trust company stock in exchange, and these the company purchased from the Blue Ridge Company at a valuation of $48.67 a share, apparently the trust company shares received back from Hambleton & Co. at $31.10. In payment to the Blue Ridge Company, assets equalling in value $48.67 a share were transferred, showing a loss of $94,200 to the trust company, which was written off on its books.

The summer of that year, 1930, was the summer of the severe drought, and because of its consequence in disabling the farmer borrowers, the trust company, in the opinion of Coblentz, suffered from it worse than any other bank in Maryland. The effect is not stated in figures, except that balances on transient deposits dropped as low as an average of sixteen per cent.

The Cumberland Steel Company, having its money on a special deposit in that summer, announced a wish to withdraw $300,000, but was persuaded by the trust company to agree on a schedule of withdrawals over the ensuing six months.

In December, 1930, a sale of first mortgages on Maryland property of a face value of $408,628.60 was arranged with a Eureka Maryland Assurance Company, at some sacrifice in the terms. The Eureka Company selected the mortgages. The trust company was to be paid the value of the mortgages less a charge of one per cent. for inspection and attorney's fees, and, with respect to such of the mortgages as by their terms bore interest below six per cent., the trust company was to make up the difference to pay the full six per cent. In addition, the trust company was to pay the mortgage taxes. In a good many instances the Eureka Company took only portions of the interests in the mortgages; the trust company retaining the remainder and subordinating its rights to those of the Eureka Company.

At that time a surety company asked that it be relieved of a bond of the trust company on which it was surety, and a bond was obtained from another company on a condition that collateral security be given by an officer or director. The condition was not exactly complied with; the collateral having been supplied by the device of furnishing securities of the trust company to an employee, substituting the employee's note, and then turning the securities over to the surety company.

The condensed statements of the company's assets and liabilities in December, 1930, and June, 1931, show a liability then on bills payable in excess of the cash and reserve, or that the entire amount of cash and reserve represented borrowed money.

In January of 1931, a director, Thomas B. Hayward, was appealed to by Coblentz to provide the company with $90,000, to pay pressing bills, and he did so by borrowing the amount from the Union Trust Company, and turning it over to the Central Trust Company. His own understanding was that he had made a loan of the amount to the trust company for a short period; but it was entered as a deposit. Upon a demand of the Union Trust Company, the amount was reduced by $10,000.

In February of 1931, the Cumberland Steel Company

was experiencing further difficulties in making withdrawals, and in May was unable to arrange a withdrawal of $25,000, the trust company president, Coblentz, objecting that the account was not a checking account but a special one, and, while repeating a hope that withdrawals might be postponed until after the harvest, suggested that the amount be withdrawn on June 10th. The steel company then directed that the account be made a checking account, but to that Coblentz demurred, suggesting that it was against the steel company's interest, and that a plan of handling the account should be worked out in an interview. Certification of a check drawn by the steel company for $93,078 was refused at that time; and when this was followed by a check drawn for the amount and put through the banks for collection, payment was refused by the trust company, and the check was protested for nonpayment. The steel company then declared its purpose to close the account, and on July 7th the vice president of the trust company suggested a plan of installment withdrawals; $6,000 on July 15th, and $25,000 on the 15th of each month thereafter, closing the account in November. Checks drawn in accordance with that plan in July and August were paid.

The last increase of capital stock was made in the spring of that year, upon the recommendation of a financial adviser before whom the condition of the company was laid, and who answered that it was necessary either that drastic reductions be made in the loans, or that new stock be issued. The issue was of only $500,000, but an effort was made to raise $1,500,000, the remainder, of $1,000,000, to be used for other purposes. Syndicates of officers and directors were organized to subscribe to stock unpaid and not otherwise subscribed to; in other words, to underwrite the issue, and for stock which they took, amounting to fifty-five or sixty per cent of the issue, they gave notes to the company and pledged the stock as collateral security for them. Collections by the syndicates, with payment to the company, reduced the amount payable, but on June 29th, 1931, $768,020 was still due

by the syndicates. The use made of money paid in is not clear.

In June of 1931, the Wardman Company, of Washington, $2,400,000 of the subordinate obligations of which were held by the trust company, passed into the hands of receivers.

Weekly statements were made up and presented by the company to its directors or to its executive committee every Tuesday, and in every one except two, from and including July 7th, to the time of closing, it appeared that the cash reserve was below the legal requirement of fifteen per cent. Code, art. 11, sec. 62 (as amended by Acts 1931, c. 503) and section 66.

At that time three-quarters of the assets had been pledged. The four subsidiary corporations mentioned were debtors of the trust company in a total amount of more than $6,000,000, exceeding the value of their assets many times. Officers of the company stood indebted in over $400,000, without ability to pay if the company should fail. The syndicates formed to take stock or guarantee assets, made up chiefly of officers or directors, stood indebted in larger amounts.

The affairs of the company were placed in the hands of the bank commissioner on September 2nd, 1931, after a conference held in Baltimore at the request of the president, with the Governor of the State and several bankers. The bankers having declined to extend further credit to the company, the receivership was inevitable.

In the absence of a more intimate knowledge of the company's affairs, and of the meaning of some proceedings, than the record affords, these incidents, selected from among many referred to, can be recited only in a somewhat disconnected form. Some of them may be susceptible of explanations other than that of pressing need of money, or unusual weakness in the assets. But with all allowances for the possibility of other explanations for details, there is sufficient to prove that the receivership and loss of the deposit were due, not to difficulties arising suddenly at the beginning of September, 1931, but

difficulties which developed and manifested themselves to the president of the company much earlier. By the spring of 1931, if not before, a deposit as large as that of the trust could not be paid easily. The legal reserve could not be kept up during the summer. In ample time before the consummation of the loss it was sufficiently demonstrated that the general deposit of the fund in that depositary no longer constituted a proper investment of it, and that, for the protection which the beneficiary was entitled to receive from the executors, the fund should be removed and converted into some safer investment. The requirement that a trustee must exercise the care that an ordinarily careful man in his situation would exercise about his own affairs need not be elaborated. *Gray v. Lynch,* 8 Gill, 403, 430; *McCoy v. Horwitz,* 62 Md. 183, 189; *Fox v. Harris,* 141 Md. 495, 119 A. 256; 1 *Am. L. Inst. Restatement, Trusts,* sec. 176 a. But it may be added that this rule does not mean that a trustee may adventure the trust assets as a business man might properly adventure his own. He may not. *Pomeroy, Equity Jurisprudence,* sec. 1074. The court is of opinion that if a stranger to the trust company's affairs, a man ordinarily careful of interests intrusted to him, had been the trustee of this fund, and in sufficient time had had disclosed to him all that the president of the company knew of those affairs, he would have considered it imperative that the fund be removed from deposit. And that is the decisive test.

As has been stated, the evidence shows that the co-trustee, or coexecutor, Fulton, exercised supervision of this trust for both. But knowledge which only the executor Coblentz, of the two, possessed, was the basis of the care required, and should have moved him to action. It is true it may be difficult for a banker himself to make a withdrawal in acknowledgment of the unsuitableness of a deposit in his bank for trust funds. The fact bears witness to the conflict of interests which may arise when a trust fund is deposited in the trustee's own bank. 3 *Bogert, Trusts & Trustees,* sec. 598. But a court could

not recognize in this any ground for compromising the duty as trustee; that duty is unyielding, and the difficulty may be avoided only by avoiding the possibility of conflict altogether; that is, by investing the fund otherwise in the beginning. It is true, too, that in 1930 and 1931 there was comparatively little conception of the seriousness of the economic depression and the possibility of its prolongation, but, on the contrary, a widespread expectation that a recovery would take place shortly. But however that condition might influence the action of the banker, it should not influence that of the trustee. It has been urged that a withdrawal of funds on deposit might have given rise to fears among the public for the safety of the trust company and endangered other depositors, and that, as all financial institutions were more or less endangered in the crisis of the times, due care would not have required trustees to prefer any other depositary to this one. But this overlooks the fact that government bonds, if nothing else, would have provided a refuge, and investment in those, under an order of court, would have aroused no fears. As has already been noticed, there was no advantage to the trust in continuing the deposit. The failure to remove it is considered culpable to such a degree as to require a decree against the executor Coblentz for restitution.

The decree appealed from must be reversed, and the cause remanded for a decree to be passed in accordance with this conclusion, holding the executor Coblentz liable and the executor Fulton not liable.

> *Decree affirmed in part and reversed in part, and cause remanded for a decree in accordance with this opinion, with costs.*

PARKE, J., dissents on the ground that Newton A. Fulton should be held responsible with his coexecutor.