## SAMUEL A. GREEN, JR. *v.* JULIA W. LOMBARD ET AL.

[No. 701, September Term, 1974.]

*Decided September 5, 1975.*

The cause was argued before POWERS and MASON, JJ., and J. DUDLEY DIGGES, Associate Judge of the Court of Appeals of Maryland, specially assigned.

*David L. Bowers,* with whom was *Patrick A. O'Doherty* on the brief, for appellant, cross-appellee.

*Daniel H. Honemann,* with whom were *Robert Sloan* and *Clapp, Somerville, Black & Honemann* on the brief, for appellees, cross-appellants Julia W. Lombard and Mimi Worthington Foster.

DIGGES, J., delivered the opinion of the Court.

Judge E. Mackall Childs, sitting by special assignment in the Circuit Court for Baltimore County, after receiving reams of testimony, concluded that Samuel A. Green, Jr., breached his fiduciary duties as substitute committee for the estate of Miss Winifred Waterman, a woman under disability who is now in her mid-eighties, and that consequently he should not only be removed from that position of trust but in addition should be surcharged for losses and certain expenses which the estate sustained due to his misdeeds. Green does not take issue on this appeal with either the trial court's conclusion that he be removed as committee or the chancellor's findings of fact; accordingly, since Green's defrocking as committee is not challenged and as the record is replete with evidence to support the chancellor's factual determinations which we do not find to be clearly erroneous (Maryland Rule 1086) we will not reassess these aspects of the trial court's decision. What is before us then are: the contentions of Green that certain aspects of the surcharge are substantively incorrect or are procedurally barred; and the assertions of the appellees, Julia W. Lombard and Mimi Worthington Foster, two nieces of Miss Waterman, who cross-appeal on her behalf and urge that under the facts and the law a more substantial surcharge should have been adjudged.[1] Before discussing the specific events which form the basis for or against the various surcharges, we set the stage by summarizing the chancellor's determinations concerning Green's stewardship as committee for Miss Waterman's estate.

---

1. The original petition to remove Green as committee was filed on November 23, 1973, by George T. Worthington, III, a nephew of the incompetent acting as an interested party. Maryland Code (1957, 1969 Repl. Vol.) Art. 93A, § 210, later recodified in Code (1974) Estates & Trusts Article, § 13-210; Maryland Rule V84 d 1. Shortly thereafter, on December 10, 1973, Lombard and Foster, also acting interested parties, petitioned both to remove Green and for an accounting. Although the two petitions were consolidated for trial, Worthington was not represented at the hearing and has not appealed to this Court.

When Green was appointed, the fiduciary of an estate for a *non compos mentis* was denominated a committee. Now a *non compos mentis* is called a "disabled person" and the fiduciary for that individual is designated as a "guardian." Code (1974) Estates & Trusts Article, § 13-101.

After a proceeding under a writ of *de lunatico inquirendo* conducted in 1937, at which Miss Waterman was found to be of unsound mind, the court entrusted her assets, shown to be $116,836.95 at the first audit, to Henry K. Ravenal as the committee for her estate. Mr. Ravenal, who during his entire term of service neither requested a counsel fee nor charged a commission in excess of five percent, served faithfully and well until his death in the winter of 1958, at which time the estate's corpus was valued at $195,127.90. Soon thereafter, in March of 1959, a substitute committee, George T. Worthington, III, was entrusted with the Waterman estate. The integrity of the first committee, however, was not to be emulated by the substitute as considerable indiscretion, it was subsequently discovered, keynoted Worthington's tenure. It was in the wake of service by these two committees, one honorable and one not, that Green, after Worthington resigned, took up the reins of managing Miss Waterman's estate in the spring of 1963.

Almost before Green had finished buttoning his newly-entrusted committee cloak he began to make thousands of dollars of mortgage loans from the Waterman estate, mostly on properties located along Charles Street in Baltimore City, to one of his own clients, Baltimore Property Management, Inc. (BPM), a corporate alter ego of King W. White, its president and Green's longtime personal friend. As time passed Green lent BPM and White personally larger and larger sums of the estate's money (determined by Judge Childs to eventually reach a total of $162,234.64), none of which loans to BPM were secured by White's personal guarantee.[2] To make matters even worse, many of the basic facts concerning the loans were not brought to the attention of the court either before or after they were made, as Green was required to do by various statutes; the information about those that were turned out to be largely incomplete,

---

2. Charles H. Steffey, Inc., a real estate agency and White's employer, also made loans to BPM, with mortgages on some of that corporation's other Charles Street properties as security. However, unlike Green, Steffey took the precaution of obtaining White's personal guarantee for the corporate loans.

inaccurate, or suspiciously self-serving. Not only were the mortgage loans imprudent and the all too infrequent accountings to the court concerning them sketchy and inaccurate but, as if to add insult to injury, Green, without discussing his unacceptable activities, successfully petitioned the court each year for the maximum commission allowed a committee as well as for substantial attorneys' fees for himself and his various associates. Bearing in mind that a committee acts in a capacity demanding un-reproachable integrity and fidelity, and which in a very general way entails three duties: "1. To carry out the trust; 2. To use care and diligence; 3. To act with good faith," 4. *Pomeroy, Equity Jurisprudence*, § 1061 (5th ed. 1941), it is painfully obvious even from this abbreviated factual exposition, that Green was an unfaithful fiduciary.

When a committee acts improperly, and this indiscretion is brought to the attention of the court, it becomes the duty of that court to assess the damage his misdeeds have caused and then to impose the appropriate sanction, including surcharging if that becomes necessary, so that the fiduciary personally is made responsible for repairing the harm he has wreaked upon the estate. *Stone v. Stone*, 230 Md. 248, 186 A. 2d 590 (1962). Accordingly, we now turn to evaluate which duties Green breached and the price he must pay for his improprieties.

While administering a trust which involves investment, a fiduciary's duty to the estate requires that he "exercise the care and skill of a man of ordinary prudence dealing with his own property." Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 93A, § 212.[3] Although that standard has only been statutorily mandated since July 1, 1969, it has long been engrained in Maryland law. *Goldsborough v. DeWitt*, 171 Md. 225, 258, 189 A. 226 (1937) (executor); *Zimmerman v. Coblentz*, 170 Md. 468, 484, 185 A. 342 (1936) (trustee); *Fox v. Harris*, 141 Md. 495, 496, 119 A. 256 (1922) (trustee); *Gilbert v. Kolb*, 85 Md. 627, 634, 37 A. 423 (1897) (trustee); *Gray v.*

---

3. Effective July 1, 1974, this section was recodified and now appears in Code (1974) Estates & Trusts Article, § 13-212.

6

*Lynch*, 8 Gill 403, 430-31 (1849) (trustee). This standard is not at variance with that used throughout the country. See 2 *Scott, On Trusts*, § 174 (3d ed. 1967); 5 *Bogert, Trusts & Trustees*, § 541 (2d ed. 1965); *Restatement, Second, of Trusts*, § 174 (1959). Our predecessors, when considering this duty with respect to the making of mortgage loans concluded, in *Gilbert v. Kolb, supra,* that the fiduciary must

> "use due diligence (1), to see that the title was valid, and (2), that the value of the property at the time of the loan is such as would in all probability be adequate security for the repayment of the loan whenever the mortgage should be called in." 85 Md. at 634-35.

As far as Green's investment activities with BPM and White are concerned, he clearly violated his duty to the estate. He failed to "see that the title was valid" and in fact has been unable to produce any certificate of title or title insurance, which, until 1970, Rule V74 d 2 specifically required him to obtain. Furthermore, and of much greater importance, Green did not fulfill the second prong of his duty as delineated in *Gilbert* in that he failed to obtain adequate security for the mortgage loans to BPM and White. This is evidenced by the fact that the original Charles Street mortgage loans were from 90 to 106 percent of the price paid by BPM, the mortgagor, only a short time before the loans were extended to purchase and improve the various tracts; such an amount in an arm's length transaction, is a prime indicator of the realty's fair market value in the absence of a definitive showing to the contrary. *Gilbert v. Kolb, supra;* 3 *Scott, On Trusts*, § 229 (3d ed. 1967) (50 to 66²/₃ percent ordinarily permissible); 7 *Bogert, Trusts & Trustees*, § 674 (2d ed. 1965) (40 to 50 percent ordinarily permissible); *Restatement, Second, of Trusts*, § 229, comment a (1959) (50 to 66²/₃ percent ordinarily permissible). Green attempts to defend against this failure to secure adequate security by proffering appraisals which state that the Charles Street tracts are worth far more than their purchase prices. But this answer is to no avail, as not

only were some of the appraisers not informed of the purchase price but the employment of all of them was actually procured by the borrower, White; [4] thus since the appraisals were not independently prepared, they must be considered suspect. *Cf. Webb & Knapp v. Hanover Bank*, 214 Md. 230, 246, 133 A. 2d 450 (1957).

The record also clearly supports the chancellor's finding that not only did Green fail to use the requisite care in regard to the BPM and White mortgage loans, but he failed in at least two other responsibilities relative to his role as the estate's investment administrator. A fiduciary is required, when he sees that a loan is no longer worthwhile, to promptly salvage the investment as best he can. As stated in *Zimmerman v. Coblentz*, 170 Md. 468, 476, 185 A. 342 (1936):

> "authority to invest in the specified form . . . is not authority to continue the investment under all circumstances. On the contrary, there is a duty on a trustee to present to the court forthwith any known condition, or condition which reasonable watchfulness would discover, and which might render it advisable that the investment be changed, and obtain its further order. *Jones v. Stockett*, 2 Bland 409, 426."

Green not only was tardy in informing the court when the mortgagor defaulted, but, when for a prudent investor the writing was on the wall as to the loan's poor health, he poured even more money into the investment.[5] Secondly,

---

4. Some of these appraisals were made by Charles H. Steffey, Inc., White's employer.

5. It must be pointed out that Green did not bring any of the defaults to the court's attention in 1967, when they occurred, other than to note after entries in his account for that year "(6 mos.)". It was not until a couple of years later, on January 23, 1969, that Green finally informed the court by petition that the Charles Street mortgages were in default. Green stated in this petition that BPM "to the best of your Petitioner's knowledge, information and belief is presently solvent." Actually, BPM's charter had been forfeited as of December 30, 1968, for nonpayment of taxes, and was not revived until April 3, 1970. In attempting to explain the situation to the court in this petition, Green observed that the area had "deteriorated severely over the past three to four years," the worst depreciation having

Green failed to "diversify investments so as to minimize the risk of large losses." 3 *Scott, On Trusts,* § 228 (3d ed. 1967); *see* 6 *Bogert, Trusts & Trustees,* § 612 (2d ed. 1965); *Restatement, Second, of Trusts,* § 228 (1959). While diversification is not under all circumstances required, *York v. Md. Trust Co.,* 149 Md. 608, 131 A. 829 (1926), a prudent man, considering the size and content of Miss Waterman's estate, the needs of the beneficiary and other relevant matters, would in all probability have concluded, as did Judge Childs, that Green should not have placed so many eggs in the BPM mortgage basket. See *Pennsylvania Co. for Insurance on Lives & Granting Annuities v. Gillmore,* 142 N.J.Eq. 27, 59 A. 2d 24, 33-34 (1948) (overinvestment in mortgages). Green, within one year of taking office, invested 61 percent of the gross estate in mortgage loans to BPM and White, his client and friend, with 41 percent secured by the Charles Street properties, and subsequently increased and re-increased the amount of those loans.

Another area of responsibility in the exercise of which Green was extremely remiss, is the fiduciary duty to keep full, accurate and precise records. This record-keeping function is required by statute, rule and case law. Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 93A, § 209 (b)(d) (effective July 1, 1969); [6] Code (1957, 1966 Repl. Vol., 1968 Cum. Supp.) Art. 16, § 135; Rule V74 (Code (1957, 1971 Repl. Vol., 1973 Cum. Supp.) (effective July 1, 1969)); [7] Rule V74

occurred since April of 1968. Green did not mention that he had substantially increased the mortgages on some of the Charles Street properties during that three to four-year-period. After noting that the rent derived from the Charles Street properties would be insufficient to cover their upkeep and the mortgages, and that a foreclosure would result in a considerable loss to the estate, Green recommended that the improvements on the land be demolished and a parking lot be constructed on the property and adjoining land owned by BPM on which Steffey held mortgages. Green asked the court to authorize the demolition, an extension of the mortgages and an increase in the mortgages' interest rate from six to eight percent, to which the court consented. After the improvements were demolished Green proceeded, though not expressly authorized to do so, to use estate funds to pay part of the cost of constructing the parking lot.

6. Effective July 1, 1974, after Green had been removed as committee, this section was recodified and now appears in Code (1974) Estates & Trusts Article, § 13-209.

7. Effective July 1, 1974, Rule V74 was partially amended. Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.), Rule V74.

(Code (1957, 1963 Repl. Vol., 1969 Cum. Supp.)); *Berlage v. Boyd,* 206 Md. 521, 532, 112 A. 2d 461 (1955), and cases cited therein; 2 *Scott, On Trusts,* § 172 (3d ed. 1967); 10 *Bogert, Trusts & Trustees,* § 962 (2d ed. 1965); *Restatement, Second, of Trusts,* § 172 (1959). Throughout Green's tenure he maintained, what might be characterized as sloppy, incomplete and inaccurate records; [8] in fact, at trial he was unable to produce any records for the years 1967-70, which he attempted to justify by claiming that he destroyed all of his estate paperwork for those years because a trust clerk in the court told him that he no longer needed to keep it. As Judge Childs said:

> "it requires no citations to say that [Green] as an attorney of sixteen years' experience was charged with knowledge of what the law requires of a guardian[; he] had no right to rely on the gratuitous advice of a clerk."

In addition to his investment and record-keeping failures, we agree with Judge Childs' finding that Green remunerated himself and his associates substantially in excess of that which is proper. If it is deserved or necessary in order to properly administer an estate, a committee may charge up to the maximum commission established by law, employ himself as attorney for the estate if one is required, *Taylor v. Denny,* 118 Md. 124, 130-34, 84 A. 369 (1912); *F. & P. Bank v. Martin,* 3 Md. Ch. 224, 225 (1852), and acquire the services of outside counsel should that be necessary and desirable, *Amer. Colonization Society's Case,* 132 Md. 524, 536-38, 104 A. 120 (1918); 3 *Scott, On Trusts,* § 188.3 (3d ed. 1967); 6 *Bogert, Trust & Trustees,* § 555 (2d ed. 1965); *Restatement, Second, of Trusts,* § 188, comment c (1959). That which Green charged in each of these respects was undeserved, unnecessary and exorbitant. During Green's approximately

---

8. Money went into and came out of the funds of the estate without any apparent reason. For example, in 1971 $850 was deposited in the estate's account for reasons which Green cannot now relate; and in 1973 a total of $7,000 was deposited which Green said he paid into the account from his personal funds because of newspaper stories relating to his handling of the estate.

.ten-year tenure the estate paid out, as far as the record now discloses,[9] a total of $45,458.45 in commissions to Green, a total of $9,650 in counsel fees to this same fiduciary, and in addition a total of $8,921.50 to outside counsel employed by Green to perform services for the estate. Although he always requested the maximum commission (10%) and hefty counsel fees, his petitions for these, except for the first two years, never explain why; in fact, for two years, 1971 and 1973, he took the full commission as well as attorney's fees but without ever asking for or obtaining court authority. Subtracting from the total estate income that part which was derived from a separate trust Green did nothing to manage,[10] in every accounting period between January 1, 1963, and December 31, 1966, Green's combined commission and counsel fee add up to a shade below half of the income his efforts yielded; in 1967 he received about 67 percent of what he produced; in 1968, 1969, 1971 and 1972 his remuneration exceeded the income from that part of the trust corpus he administered, with the 1970 figures merely a few dollars apart; however, it is true that in 1973 he received only 16 percent of what his efforts produced.

Based on the evidence, including that which we have briefly related, Judge Childs summed up Green's multitudinous transgressions as follows:

"a) As guardian of Miss Waterman, the defendant [(Green)] failed in his duty to maintain accounts and records which were accurate, precise, complete and regular.

b) He failed in his duty to exercise his powers as guardian with the care and skill that ordinary prudence required.

9. Most of the figures from which these totals are computed were derived from obviously unreliable reports furnished by Green.

10. A considerable portion of Miss Waterman's income (e.g., in 1973 $20,769.45) is derived from a trust, of which she is a beneficiary, being administered by the St. Louis Union Trust Company, as trustee.

c) He failed in his duty to furnish the court with complete and accurate information when requesting authorization to invest.

d) He failed in his duty to report to the court the defaults under mortgages as soon as they occurred, thereby exposing the estate to the probability of greater loss than it would have sustained but for his failure to act.

e) He either wilfully misrepresented material facts to the court leading to action by the court in reference to the fiduciary estate, or made said statements with such careless disregard for their accuracy as to constitute a wilful misrepresentation.

f) He failed in his duty to require security for estate funds expended.

g) He spent estate funds without sanction of the court.

h) He failed in his duty to exercise good faith and loyalty to the fiduciary estate."

We think that this is an appropriate recapitulation which is amply supported by the evidence and certainly is not clearly erroneous. (Rule 1086).

From the storm raging about his regime as committee, Green seeks the shelter of several *ex parte* court orders, which on their face authorized him to make various expenditures and investments, asserting that these orders, as they "contained no reservation of equities or power of further direction," *Pinkston v. Swift,* 231 Md. 346, 351, 190 A. 2d 533 (1963), quoting *Pugh v. Waclawski,* 211 Md. 346, 350, 127 A. 2d 376 (1956), were final decrees or at least orders in the nature of final decrees, such that they became enrolled thirty days after they were entered, dates which have long since passed.[11] Rule 671 a. While it is true that

11. It is noted that Green did not elect to utilize Rule V74 c 2 (f), adopted pursuant to Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 93A, § 209

once enrolled, these equity decrees ordinarily become absolute, they nevertheless are subject to review upon a showing "of fraud, mistake or irregularity." Rule 625 a. As used in that rule, "fraud, which is an act of deliberate deception designed to secure something by taking unfair advantage of someone, includes *deceit*, though the latter may not reach the gravity of fraud." *Cohen v. Investors Funding Corp.*, 267 Md. 537, 540, 298 A. 2d 154 (1973), quoting *Tasea Investment Corp. v. Dale*, 222 Md. 474, 478 n. 1, 160 A. 2d 920 (1960). Fraud is a generic term and in equity embraces "all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." 1 *Story, Equity Jurisprudence*, § 187 (6th ed. 1853). It is not necessarily a single fact but a conclusion which is drawn from all the circumstances of the case, *Brogden v. Walker's Ex'r*, 2 Harr. & J. 285 (1805), and includes constructive as well as actual fraud. *Mead v. Gilbert*, 170 Md. 592, 606, 185 A. 668 (1936). It taints and vitiates all that it touches. *Figinski v. Modrak*, 151 Md. 140, 146, 134 A. 130 (1926). This is especially true when the victim occupies a position of confidence and trust with the perpetrator of the fraud and is either an aged and infirm person, an infant, or is one suffering from mental illness.

---

(c), now appearing in Code (1974) Estates & Trusts Article, § 13-209. That rule provides:

"(f) Protection of Court Order.
A fiduciary wishing to establish an accounting as conclusive with respect to his liabilities concerning the matters disclosed in connection therewith may petition the court for an order to such effect. He shall send a copy of the account to all persons as to whom he wishes to make the account conclusive, together with notice to show cause, within a time to be fixed by the court, why the relief prayed should not be granted. Where notice cannot be given to any person, such person may be served by publication. An order may be passed after such notice or service, and opportunity for hearing, establishing the conclusiveness of the account as to the persons to whom notice was given or service was made. Unless for good cause shown the court orders otherwise, the expense of a proceeding under this paragraph shall be borne by the fiduciary personally and not the fiduciary estate."

"Fraud may consist in a suppression of the truth as well as in the assertion of a falsehood. The concealment becomes a fraud where it is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts. . . . ' There is a distinction between the suppression of a fact and mere silence. Where there is an obligation to speak [(as there was in this case)], a failure to speak will constitute the suppression of a fact; but where there is no obligation to speak, silence cannot be termed suppression,' . . . ." *Schnader v. Brooks,* 150 Md. 52, 57-58, 132 A. 381 (1926) (citations omitted).

The court orders procured by Green, and whose shield he seeks to hide behind, were granted *ex parte,* on the basis of petitions containing, as the chancellor found, serious material misrepresentations, in violation of several Maryland rules, which wilful defaults or acts of gross negligence constitute clear and convincing evidence of, at least, constructive fraud. *Accrocco v. Splawn,* 264 Md. 527, 532, 287 A. 2d 275 (1972); *Gray v. Lynch,* 8 Gill 403 (1849). Accordingly, because fraud permeates the decrees relating to court approval of Green's activities and expenses, they are all now subject to review by virtue of Rule 625 a, with the exception of those expenditures for the care of Miss Waterman until January 1, 1967, which the appellees do not contest because they have already been scrutinized by court auditors.

In addition to showing either "fraud, mistake or irregularity," "one seeking to set aside an enrolled judgment must establish also that he is acting in good faith and with ordinary diligence, and that he has a meritorious defense."

*Owl Club v. Gotham Hotels,* 270 Md. 94, 100, 310 A. 2d 534 (1973); *Marine Midland v. State Nat'l Bk.,* 268 Md. 503, 511-12, 302 A. 2d 609 (1973). Although the appellees' good faith is not questioned and there is no doubt but that there are sufficient defenses to some of the expenditures approved by the enrolled decrees, Green does challenge the timeliness of the appellees' suit by arguing that it is barred by the statute of limitations and laches. But since the appellees bring this action on behalf of a *non compos mentis* [12] whose status had not changed since 1937, the statute of limitations has not begun to run, Code (1957, 1972 Repl. Vol., 1973 Cum. Supp.) Art. 57, § 2, rewritten and recodified as Code (1974) Courts and Judicial Proceedings Article, § 5-201 (effective January 1, 1974); *Funk v. Wingert,* 134 Md. 523, 526-27, 107 A. 345 (1919), nor for the same reason can laches bar consideration of the claims. *Fid & Dep. Co. v. State,* 164 Md. 304, 314-16, 165 A. 176 (1933); 3 *Scott, On Trusts,* § 219.3 (3d ed. 1967); 9 *Bogert, Trusts & Trustees,* § 949 (2d ed. 1965); *Restatement, Second, of Trusts,* § 219, comment d (1959). As for the requirement of simple diligence, we think that the appellees cannot be accused of dawdling considering the speed with which they moved once they became apprised, in late 1973, of the actual facts.

## THE REMEDY

Based on the extensive evidence that Green was in violation of his fiduciary responsibilities, we see no escape from the chancellor's conclusion that not only should Green be removed from his position as committee, but he should also be surcharged so that the estate can be placed in the same situation as if he had faithfully performed his proper duties. However, because we think that Judge Childs restricted himself from scrutinizing various periods of Green's tenure which we conclude ought to be subjected to

---

12. Since the appellees' petition specifically states that the action is instituted on behalf of Miss Waterman, Green's suggestion that the claim was brought on the appellees' behalf is dismissed as frivolous.

review and because the chancellor deviated, obviously inadvertently, from the actual credit (including failure to allow in Green's favor the amount which a sale of the mortgages, if sold, or of the property, if sold through foreclosure, brings) and debit figures in making certain calculations, the case must be remanded so that the amount of the surcharge can be reassessed. On remand the chancellor, with the assistance of a master and auditor if he deems it necessary, should review all transactions involving this trust, both the income and outflow of money, during Green's entire tenure as the committee of Miss Waterman's estate.[13] In reevaluating the monetary charges to be imposed against Green, every expenditure from the estate by this former committee for whatever purpose, from the beginning of his term to the end (except for monies spent for the care of Miss Waterman up to January 1, 1967 which the appellees do not contest because they have already been scrutinized by court auditors), is to be subject to judicial scrutiny and is to be debited against Green, with a credit, however, in his favor for those expenditures which through primary or secondary evidence he can satisfy the court were justified. *Berlage v. Boyd,* 206 Md. 521, 532, 112 A. 2d 461 (1955); *Richmond v. Richmond,* 165 Md. 388, 391, 168 A. 883 (1933); *Dennis v. Dennis,* 15 Md. 73 (1860). "Obscurity visits responsibility upon the trustee," *Berlage v. Boyd, supra* at 532 and, therefore, "a trustee who fails [as did Green] to keep proper accounts has the burden of proving entitlement to the credits he claims." *Lopez v. Lopez,* 250 Md. 491, 502, 243 A. 2d 588 (1968); *see Lawson v. Burgee,* 131 Md. 436, 442-43, 103 A. 516 (1917); 2 *Scott, On Trusts,* § 172 (3d ed. 1967); 10 *Bogert, Trusts & Trustees,* § 962 (2d ed. 1965); *Restatement, Second, of Trusts,* § 172, comment b (1959). For the further guidance of the chancellor on remand we specifically suggest an approach to the calculation of two items with which he will be concerned in performing his many-faceted task.

---

**13.** Audits which have already been properly prepared can be utilized if that would minimize the task; additional testimony may be taken if that becomes necessary or advisable.

In the calculation of the surcharge for the losses to the estate caused by Green's mortgage investments a proper formula must be utilized. Ordinarily, if the loans were authorized and free of any taint other than simple negligence, "the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest[, to the extent of such excess]." *Restatement, Second, of Trusts,* § 228, comment b (1959); see 3 *Scott, On Trusts,* §§ 228.1, 229.1 (3d ed. 1967); 7 *Bogert, Trusts & Trustees,* §§ 674, 701, 705-06 (2d ed. 1965). However, since Green made the loans and withheld from the court, *ab initio,* information identifying his close ties with BPM and White, information concerning the true value of the properties, and other pertinent details relating to the mortgages, the entire investment must in effect be considered to be tainted by fraud and, therefore, the proper surcharge calculation should involve the following: add all of the mortgage loans advanced, calculate the interest that should have been paid, arrive at a sum total for all the advances made by the estate in connection with the mortgages as well as the properties secured by them (*e.g.,* taxes, insurance, improvements such as demolition of old structures and construction of the parking lot); once all these sums are added together subtract from that figure the net proceeds received for the sale of the property at foreclosure or otherwise or from a sale of the mortgages themselves together with all returns received by the estate on the investment (*e.g.,* payments on principal or interest).

Secondly, all of the committee or attorney charges which were paid from the estate throughout Green's ten-year tenure should, upon remand, be re-examined by the chancellor for him to use his discretion as to which of these, if any, to permit, once presented with the pertinent information upon which to base such a judgment. Should the chancellor, in the exercise of his discretion, decide to disallow any or all of the commissions and attorney's fees then Green should be surcharged for those amounts.

Of course, as it appears from the record that Green put some of his own money in the coffers of the estate (*e.g.,* $800,

$850 and $7,000), this total should be credited in arriving at the final surcharge.

> *Order of the Circuit Court for Baltimore County, dated June 20, 1974, removing Samuel A. Green, Jr., as Committee of the Estate of Winifred Waterman and providing for the transfer of estate assets to a new guardian, affirmed.*
>
> *"Charging order" dated June 20, 1974, vacated and the case is remanded to the Circuit Court for Baltimore County for further proceedings, including the passage of a new "charging order", consistent with the views expressed in this opinion.*
>
> *Costs to be paid by Samuel A. Green, Jr.*